No. 99-174

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 222

301 Mont. 195

9 P.3d 607

SANDRA BULEN, Personal Representative

of the Estate of JILL M. METZGER, and RON LaFURGE,

as Guardian of ALISA LaFURGE, ARCHIE LaFURGE,

and ANDREA LaFURGE,

Plaintiffs and Respondents,

v.

NAVAJO REFINING COMPANY, INC.,

MONTANA REFINING COMPANY (an alleged

partnership) and NAVAJO NORTHERN, INC.,

Defendants and Appellants.


APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Stephen H. Foster, Kyle A. Gray, and W. Scott Mitchell,

Holland & Hart, LLP, Billings, Montana

Richard F. Gallagher and Timothy B. Strauch, Church, Harris, Johnson &

Williams, P.C., Great Falls, Montana

For Respondents:

Monte Beck, Beck & Richardson, P.C., Bozeman, Montana

Joe Bottomly, Bottomly Law Offices, Kalispell, Montana

Submitted on Briefs: November 4, 1999

Decided: August 15, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Plaintiffs filed a complaint in the District Court for the Eighth Judicial District in Cascade County, in which they alleged that the Defendants caused the death of Jill M. Metzger. After extensive discovery, the Plaintiffs moved for discovery sanctions. The District Court granted the motion and sanctioned the Defendants by imposing liability. The Defendants then moved the District Court to reconsider its imposition of sanctions. Following a hearing, the District Court refused to reconsider its order. The Defendants appeal from the District Court's imposition of sanctions. We affirm the judgment of the District Court.

¶2 While the Appellants raise a number of issues on review, we find the following issue dispositive:

¶3 Did the District Court abuse its discretion when it sanctioned Montana Refining Company and Navajo Refining Company pursuant to Rule 11, M.R.Civ.P., by imposing liability as a matter of law?

## FACTS

¶4 On April 6, 1994, Jill Metzger's body was found lying next to a Hydotreater Unit (HTU) [(1)] in a petroleum refining plant located in Great Falls, Montana. The Plaintiffs alleged that Metzger died from inhalation of hydrogen sulfide gas after it escaped from the HTU.

¶5 On December 8, 1994, the Plaintiffs filed a complaint against the parties that designed and constructed the HTU. On February 13, 1997, with leave of the District Court, the Plaintiffs filed their second amended complaint, in which they added, among others, Navajo Refining Company, Inc. and Montana Refining Company (MRC) as Defendants. The Plaintiffs alleged that Navajo Refining had control over the planning, construction, and operations of the HTU as well as the supervision and training of personnel operating the HTU. The Plaintiffs alleged that MRC intentionally exposed Metzger to a high degree of danger and death by allowing her to operate the HTU, and that such conduct was not covered by the exclusive remedy provision of the Workers' Compensation Act.

¶6 Following extensive discovery, the Plaintiffs settled their claims with the parties who designed and constructed the HTU. MRC, Navajo Refining, and Navajo Northern, however, remained parties to the suit. Following the Plaintiffs' motion to compel discovery and for sanctions, on September 15, 1998, the District Court imposed liability on MRC and Navajo Refining as a sanction for discovery abuse. The District Court's decision was based on the following findings:

> Defendants misrepresented that the corporations were totally separate and there was no "discoverable control" over documents or management between the partnership corporations and parent corporations;

> Defendants falsely represented in briefs and at hearing, that all documents pertaining to the accident investigation had been provided. They knowingly withheld and concealed significant information regarding the existence of the first investigation as well as reports and notes about it;

> Defendants falsely represented in discovery responses, that Navajo Refining Co.

Inc. supplied no specifications in the design or construction of the HTU plant, or that any of its employees met or consulted with MRC, Jacobs/Wolder Engineering as to the design and construction of the HTU; and

Defendants falsely represented that the Laurent investigation documents had been prepared for the purposes of litigation.

MRC and Navajo Refining moved the District Court to reconsider its imposition of discovery sanctions. Following a hearing conducted on November 9, 1998, the District Court denied MRC and Navajo Refining's motion to reconsider. MRC, Navajo Refining, and Navajo Northern, then partially settled with the Plaintiffs. The parties, however, stipulated that full settlement was contingent on the outcome of an appeal to this Court.

## Ownership and Management of MRC

¶7 To understand this case, it is important to understand the ownership and management structure of the petroleum refinery plant located in Great Falls, Montana. The plant is owned by MRC, which is a general partnership. The partners are Navajo Northern, Inc., and Black Eagle, Inc., which are both owned by Navajo Refining Company, Inc. Navajo Refining has its headquarters in Artesia, New Mexico, and is wholly owned by Holly, Inc.

¶8 Navajo Northern paid the salaries of MRC's managerial employees, and Black Eagle paid the wages of MRC laborers, including Metzger. Other than being partners in MRC and paying MRC's employees, Navajo Northern and Black Eagle had no other business and no physical existence; they had no desks, no office, and no headquarters.

¶9 Christopher Cella was the vice-president, general counsel, and secretary of Holly. Cella was also the secretary of each of Holly's subsidiaries, which included Navajo Refining. Cella testified that he was responsible for all legal matters involving Holly and its 16 subsidiaries.

¶10 John Knorr was the general manager of MRC, the president of Navajo Northern, and a vice-president of Navajo Refining. Knorr testified that he had the authority to transact business on MRC's behalf and to hire and fire MRC workers. He also testified that he participated in monthly meetings at MRC in Great Falls during the construction phase of the HTU. Knorr testified that the reason he attended those meetings was to "see where we were versus our budget and where they were versus their time schedule." Knorr also

testified that the meetings were attended by Lamar Norsworthy, Carl Knapp, and Jack Reid. Norsworthy is the chairman of Holly's board, and is also Holly's CEO and Navajo Refining's CEO. Knapp is an employee of Holly. Reid is the vice-president of Navajo Northern.

¶11 According to Knorr's testimony, Navajo Northern was designated as the managing partner in MRC. Knorr testified that Navajo Northern delegated its duty to manage MRC to Navajo Refining. Navajo Northern also assigned its right to receive a management fee of $40,000 per month from MRC to Navajo Refining. Knorr testified that part of the management fee that Navajo Refining received was used to pay his salary; and, although Knorr was the president of Navajo Northern and the general manager of MRC, he receives no salary from either. He testified that Navajo Refining paid 100 percent of his salary. According to Knorr's testimony, Reid also had authority to manage MRC.

¶12 Leland Griffin was MRC's manager at the refinery plant located in Great Falls, Montana. His supervisor was Knorr. Richard Gallagher was MRC's attorney in Great Falls at the time of Metzger's death.

## Investigation of Metzger's Death

¶13 Griffin testified that on the day of the accident, he called together an investigation team, which included himself, the refinery's safety director, and the refinery's process superintendent. Griffin testified that their initial findings indicated that Metzger had died from inhalation of hydrogen sulfide. Griffin testified that he called Gallagher, and that they discussed the investigation and the possibility of litigation.

¶14 Griffin also testified that on the day of the accident, he called Reid in New Mexico and reported the accident. Reid then contacted Knorr. Knorr testified that he and Reid discussed the accident and decided to send Duke Younger, John Laurent, and Don Prout, all employees of Navajo Refining, from New Mexico to Great Falls to conduct an investigation into the cause of Metzger's death.

¶15 On the day following the accident, Younger and Laurent arrived in Great Falls, where they met with Griffin and Gallagher. Griffin testified that Laurent took over the investigation. Griffin said that he did not recall any of the investigators taking notes, but stated that they used a tape recorder. He testified, "When I initially convened the investigation, we kept a tape-recording of interviews with the people that initially

responded. Whether there was any handwritten notes, I don't recall." Laurent testified that "[d]uring the incident investigation, we gathered some notes; we did some interviews, I remember. Some were penciled and then some were transcribed." Laurent testified that after he finished his investigation, he concluded that Metzger had committed suicide by inhaling hydrogen sulfide. He also testified that he did not conduct the investigation for the purpose of litigation:

> A. We weren't doing an investigation for a lawsuit; we weren't doing an OSHA investigation to try to get money for the federal government. We were interested in determining what killed Jill Metzger-

> . . . .

> Q. Okay. Your to-do list that you gave to Joe, was that for purposes of the investigation and not anything to do with a lawsuit?

> A. Yes.

¶16 After Laurent returned from Great Falls to New Mexico, he turned the investigation over to Joseph Ysusi, an employee of Navajo Refining. Ysusi testified that the material Laurent gave to him was "a typewritten report in draft form with some written notes on the report, itself." Ysusi testified that he reviewed Laurent's report, the audio tapes, and spoke with both Younger and Laurent. Ysusi testified that after he read Laurent's report, he felt that Laurent's investigation was not adequate, and that another investigation was necessary. Ysusi stated:

> From my personal experience and my training that I've had when I worked for the Department of Energy, we were trained to do detailed investigations based on the severity of the incident. And when I reviewed the initial draft investigation report, I just did not feel that it was adequately conducted.

Although Ysusi made no inquiry of the physical findings of Metzger's body, Ysusi concluded that the cause of Metzger's death was uncertain. He testified that it was possible that Metzger died from overexposure to hydrogen sulfide, but that he could not validate such a possibility unless he was 100 percent certain.

¶17 After the Plaintiffs filed their complaint, they began extensive discovery. The facts

specifically relating to discovery will be discussed as appropriate below.

## STANDARD OF REVIEW

¶18 When we consider whether a district court imposed proper sanctions for discovery abuse, we determine whether the district court abused its discretion. *Sullivan v. Sisters of Charity of Providence of Montana* (1994), 268 Mont. 71, 77, 885 P.2d 488, 492. We defer to the trial court because it is in the best position to know whether the party in question has disregarded the other's rights, and is in the best position to determine which sanction is most appropriate. *Sullivan*, 268 Mont. at 77, 885 P.2d at 492.

## DISCUSSION

¶19 The purpose of the Montana Rules of Civil Procedure is to "secure the just, speedy, and inexpensive determination of every action." Rule 1, M.R.Civ.P. When litigants and their attorneys abuse the rules they are subject to sanctions. *See Sullivan*, 268 Mont. at 77, 885 P.2d at 492. The district courts should punish those who engage in dilatory discovery actions rather than patiently encourage their cooperation. *Morris v. Big Sky Thoroughbred Farms, Inc.*, 1998 MT 229, ¶ 13, 291 Mont. 32, ¶ 13, 965 P.2d 890, ¶ 13 (*citing Owen v. F. A. Buttery Co.* (1981), 192 Mont. 274, 278, 627 P.2d 1233, 1235). "When litigants use willful delay, evasive response, and disregard court directions as part and parcel of their trial strategy, they must suffer the consequences." *Owen*, 192 Mont. at 280, 627 P.2d at 1236. If one party does not properly respond to discovery and the other party suffers prejudice, a district court has the authority to impose default judgment as a sanction. *Sullivan*, 268 Mont. at 77, 885 P.2d at 492. In *First Bank (N.A.)-Billings v. Heidema* (1986), 219 Mont. 373, 376, 711 P.2d 1384, 1386, we held:

> Where it is determined that counsel or a party has acted willfully or in bad faith in failing to comply with rules of discovery or with court orders enforcing the rules or in flagrant disregard of those rules or order, it is within the discretion of the trial court to dismiss the action or to render judgment by default against the party responsible for the default . . . . Litigants who are willful in halting the discovery process act in opposition to the authority of the court and cause impermissible prejudice to their opponents. It is even more important to note, in this era of crowded dockets, that they also deprive other litigants of an opportunity to use the courts as a serious dispute-settlement mechanism.

(Citing *G-K Properties v. Redevelopment Agency, of San Jose* (9th Cir.1978), 577 F.2d 645, 647.)

ISSUE

¶20 Did the District Court abuse its discretion when it sanctioned MRC and Navajo Refining pursuant to Rule 11, M.R.Civ.P., by imposing liability as a matter of law?

¶21 Rule 11, M.R.Civ.P., provides:

> Every pleading, motion, or other paper of a party represented by an attorney shall be signed by at least one attorney . . . .
>
> . . . .
>
> The signature . . . constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law . . . , and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
>
> . . . .
>
> If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction . . . .

Signing a document pursuant to Rule 11, M.R.Civ.P., essentially certifies that: (1) the attorney made a reasonable inquiry into the facts surrounding the document; (2) the attorney made a reasonable inquiry into the law supporting the document to insure that it is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and (3) the attorney did not interpose the document for any improper purpose, such as to harass or cause unnecessary delay or a needless increase in the cost of litigation. *See Hodges v. Cannon* (Ark. Ct. App. 1999), 5 S.W.3d 89, 99. In exercising its discretion pursuant to Rule 11, the trial court must avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any doubt must be resolved in favor of the signer. *In re the Adoption of R.D.T.* (1989), 239 Mont. 33, 36,

778 P.2d 416, 418 (citing *Eastway Constr. Co. v. New York* (2d Cir. 1985), 762 F.2d 243, 254). In *Eastway Construction Co.*, the court stated:

> In framing this standard [for awarding Rule 11 sanctions] we do not intend to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law. Vital changes have been wrought by those members of the bar who have dared to challenge the received wisdom, and a rule that penalized such innovation and industry would run counter to our notions of the common law itself. . . . But where it is patently clear that a claim has absolutely no chance of success under the existing precedent, and where no reasonable argument can be advance to extend, modify or reverse the law as it stands Rule 11 has been violated.

762 F.2d at 254.

### Misrepresentations Regarding Ownership and Control

¶22 On March 3, 1997, Navajo Refining and MRC moved to dismiss several counts of the Plaintiffs' second amended complaint. In its brief, Navajo Refining contended that the Plaintiffs failed to state a claim for negligence because Navajo Refining owed no duty to Metzger. In its reply brief, Navajo Refining asserted:

> It is clear from Mr. Johnson's testimony that the only services provided by Navajo to MRC consist of occasional safety consultation and training pursuant to a consulting agreement with MRC, and some accounting services. There is simply no evidence that Navajo had anything to do with HTU at all.

This statement misrepresented the relationship between MRC and Navajo Refining. As will be discussed below, many of Navajo Refining's employees attended meetings regarding the design and construction of the HTU. Further, as a result of the assignment of Navajo Northern's management contract, MRC paid Navajo Refining $40,000 per month to manage the Great Falls, Montana, refinery. Navajo Refining's vice-president, John Knorr, was the general manager of MRC. While Knorr had several different titles in various companies, Knorr was paid exclusively by Navajo Refining, and part of his job was management of MRC. Knorr testified that he had the authority to overrule Griffin's decisions; that he had the authority to transact business for MRC; and that he had the authority to hire and fire MRC's workers. These facts contradict the Defendants' assertion that "there is simply no evidence that Navajo had anything to do with HTU at all."

## Standards and Specifications

¶23 During discovery the Plaintiffs tried to discover MRC's and Navajo Refining's involvement in the design and construction of the HTU. The Plaintiffs sought design and construction documents. They also sought to discover Navajo Refining's employees' involvement in the design and construction of the HTU. However, Navajo Refining responded that it had no design and construction documents in its control, and that no Navajo Refining specifications had been used in the construction of the HTU. MRC also responded that it did not have any of Navajo Refining's design and construction documents. Navajo Refining claimed that none of its employees participated in the design or construction of the HTU.

¶24 On April 28, 1997, Navajo Refining responded to the Plaintiffs' discovery requests as follows:

> REQUEST FOR PRODUCTION NO. 1: Please produce any standards, specifications, drawings, or plans sent by Navajo to MRC for the design or construction of the HTU unit located in Great Falls, Montana.
>
> RESPONSE: Navajo will not produce documents as requested in Request No. 1 for the reasons that there are no such documents in their possession, custody, or control.
>
> . . . .
>
> INTERROGATORY NO. 4: Did Navajo provide any "standards" or specifications to Wolder or Jacobs for the design, construction, inspection, or testing of the HTU unit in question?
>
> RESPONSE: No.

At the hearing held on November 9, 1998, John Knorr, who signed the discovery responses on behalf of Navajo Refining, along with Gallagher, explained the responses as follows:

> Q. So they supplied them to whom, MRC - Navajo gave [the standards] to MRC?
>
> A. In 1984.

Q. Then in turn, did MRC, to your understanding, provide them to Jacobs Engineering?

A. I don't know if they've been modified or not since Navajo gave them to them in 1984.

Q. My question is, did Navajo standards and specs go to Jacobs Engineering?

A. My answer is, I don't know if they've been modified or not since Navajo gave them to Montana [MRC] eight years before.

Q. Even if they were modified, did the modified set go to Jacobs Engineering?

A. *Montana [MRC] supplied their general standards to Jacobs for construction of the unit.*

(Emphasis added.)

¶25 On April 28, 1997, MRC provided the following response to the Plaintiffs' request for production.

REQUEST FOR PRODUCTION NO. 2: Please provide a copy of the specifications and standards received by MRC from Navajo which pertain to the design or construction of the HTU unit.

RESPONSE: MRC will not produce documents as requested in Request No. 2 for the reason that there are no such documents in their possession, custody, or control.

¶26 At the hearing held on November 9, 1998, Griffin, who signed MRC's discovery responses, along with Gallagher, explained the responses as follows:

Q. All right, sir. Now we know, don't we, because we subpoenaed the records of Jacobs Engineering, that in fact you do have Navajo specs, Navajo standards relating to this project?

A. If you want to define do they display anything specific to the HTU, which is what your question just asked, no, they did not. They provided standard

specifications with the Navajo logo on it, and it talks about the general specifications for the project, they supplied them to Montana Refining Company many years prior to this project. And they are general construction standards used throughout the industry.

Q. Yes.

A. And they are not specific to this unit or any other unit.

Q. But they were sent to Jacobs Engineering for the building of this project, weren't they?

A. I don't know.

Q. Okay. Well, if we got those standards from Jacobs Engineering-

A. Then I would assume so.

Q. Thank you. Mr. Griffin, again, I asked you when you're answering those discovery requests why aren't you telling us that, yes, we do give Navajo standards and specifications, but really, Mr. Beck, they're general construction standards, they're not Navajo specific to this project. Why didn't you inform us that that was done in your answer to the discovery?

A. I have to say on advice of counsel.

¶27 In his affidavit of October 5, 1998, Gallagher admitted that many of Navajo's "standard specifications" were in the possession of MRC at the time of Metzger's death, he stated:

I learned that The Pritchard Corporation had done the process design and that Wolder Engineers & Constructors had done the construction. I inquired about the involvement of Navajo Refining Company in the design and construction of the HTU and I was advised that it had no involvement. Mr. Griffin showed me a set of "standard specifications" that he maintained in his office, many of which bore the logo of Navajo Refining Company. Mr. Griffin advised me that he understood that those "standards specifications" had been given to Montana Refining Company when an interest in the Montana Refining Company was acquired by Holly

Corporation in 1984 and that the "standard specifications" were in the refinery when he took over the position of refinery manager in 1989. . . . I reiterated my prior advice that a complete investigation of the incident be undertaken due to concern that because of the "standard specifications" Navajo Refining Company may have exposure to a third party claim.

¶28 At the hearing held on November 9, 1998, Griffin testified:

Q. All right. What about the standard specifications for design and construction of this unit?

A. Well, Mr. Gallagher had asked, because it was a new unit, kind of the structure, you know, of who was involved in the building of it because of the potential of third-party lawsuits. And I explained to him that Pritchard Corporation did the process design, and Wolder/Jacobs did the mechanical design and construction. *That some general construction standards that have Navajo Refining's logo on them were used in the construction.* Kind of gave him a general rundown of who was involved in it, in the building of that unit.

(Emphasis added.)

¶29 In addition to the construction standards, the Plaintiffs also sought to discover what involvement Navajo's employees had in the construction and design of the HTU. On April 28, 1997, MRC gave the following responses to the Plaintiffs' discovery requests:

INTERROGATORY NO. 4: Please list the names of all Navajo employees that met or consulted with MRC, Jacobs Engineering, or Wolder Engineering employees concerning the design, construction, and testing of the HTU unit and describe the position and job duties of each Navajo employee listed.

ANSWER: None.

¶30 At his deposition held on December 3, 1997, Knorr gave the following testimony regarding his involvement in the design and construction of the HTU:

Q. I'd like to talk some more about the construction of the HTU plant. Were you personally involved in the relationship between Montana Refining Company and

Jacobs and Wolder Engineering?

A. Yes.

Q. For instance, did you attend monthly progress meetings on the construction?

A. Yes, I did.

. . . .

Q. Okay. And-And what did you- what was the general purpose of the meetings?

A. The general purpose of the meetings was to see where we were versus our budget and where they were verses their time schedule.

¶31 On June 24, 1998, at his deposition, James Case, a chemical process engineer, who assisted in the design of the HTU, testified that he discussed design options with officers of Navajo Refining. He testified as follows:

Q. Okay. So do I understand you to say that this is a telephone conference between yourself and certain management at Montana refinery and Navajo regarding design options at the hydrotreating unit?

A. Yes.

Q. Okay. And was Mr. Knorr and Mr. Reed involved in that conference?

A. According-I don't recall that directly, but according to what I wrote at the time Jack Reed, who was president of Navajo Refining, and John Knorr, who was president of Montana Refining, as well was Leland Griffin, and Dana Leach from Montana Refining, were involved.

Q. Okay. In the second page there's an indication a Mr. Jack Reed making some-no, let's see-it's the second paragraph, first page, right here, he appears to be asking for some design criteria; can you just tell me what he's basically inquiring about?

A. Yes. He's asking if an existing cat feed reformer with a high recycle ratio could be used to process, change it from a reformer operation to a cat feed diesel

hydrotreating operation.

. . . .

A. He was asking us to look to see if it might be possible for a unit of this nature to be adapted to use for the requirement at Montana Refining.

¶32 At the hearing held on November 9, 1998, Knorr testified as follows concerning Navajo's responses to the Plaintiffs' discovery requests:

Q. Now, you attended meetings up here in Montana relative to the progress of the construction?

A. Yes.

Q. Sir, why did-or let me ask you not a why, but there was a discovery request that asked for a list of names of Navajo employees that met with, consulted with MRC, Jacobs Engineering or Wolder people concerning the design, construction, testing of the HTU unit, and describe the position and job titles of each such Navajo employee listed. Are you aware of what the discovery says as to the people that were involved with anything to the building of that plant?

A. No.

. . . .

Q. So, sir, when we were told and everybody else in the lawsuit was told that there was no Montana Refining employee that had ever been involved with this new unit, that was not true, was it?

A. You said Montana Refining. I'm not sure what you meant to say.

Q. I'm sorry, let me start over. It is not true, is it, sir, that Navajo employees did not ever consult up here relative to the construction, design or testing of the HTU unit that was being built?

A. They did not in their status as Navajo Refining employees. They did as

representatives of Navajo Northern, Inc.

¶33 Knorr further testified that he and Jack Reid traveled to Great Falls to discuss the construction project, and that another employee of Navajo Refining, Tom Astin, provided general safety training to MRC's employees, including Metzger.

¶34 Pursuant to Rule 11, M.R.Civ.P., Gallagher was obligated to make a reasonable inquiry before signing the Defendants' discovery response, including whether MRC had "construction standards" it received from Navajo Refining and whether Navajo Refining's employees were involved in the design and construction of the HTU.

¶35 Rule 11, M.R.Civ.P., further prohibits an attorney from interposing a document "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." The Appellants contend that the discovery responses signed by Gallagher were proper. They contend that they did not produce the construction standards because the standards were "general" and not "specific" to the HTU located at the refinery in Great Falls and because MRC acquired the standards in 1984 and the HTU was not constructed until 1993. The Appellants characterize the meetings attended by Navajo Refining's employees as "budget meetings." They assert that "[a]ttending budget meetings is not 'participation' in the design or construction of a highly technical mechanical unit." The District Court, however, disagreed. After the hearing held on November 9, 1998, at which Cella, Griffin, and Knorr testified, the District Court found:

> Defendants falsely represented in discovery responses that Navajo Refining Company, Inc., supplied no specifications on the design or construction of the HTU plant, or that any of the employers met or consulted with MRC, Jacob/Wolder Engineering, as to the design and construction of the HTU.

The District Court found that the Defendants had interposed their discovery responses for an improper purpose. It held:

[T]he Defendants, in violation of Discovery Rules, have not properly and forthrightly disclosed material facts relevant to this matter, thereby impeding the orderly administration of justice. Rule 11 was violated time and again when facts represented to the Court and Counsel . . . were not true, were misleading, and not grounded upon reasonable inquiry.

The District Court was in the best position to evaluate the credibility of the Defendants' witnesses and, by weighing the evidence to determine the Defendants' involvement in the design and construction of the HTU. *See Sullivan*, 268 Mont. at 77, 885 P.2d at 492.

¶36 The Appellants further contend, in reliance on *In re the Adoption of R.D.T.* (1989), 239 Mont. 33, 36, 778 P.2d 416, 418, that the District Court's use of deposition testimony solicited subsequent to the Appellant's discovery responses invoked the wisdom of hindsight and that doing so results in a Kafkaesque nightmare. The Appellants, however, have misconstrued our holding in *Adoption of R.D.T.* and Franz Kafka.

¶37 In *In re the Adoption of R.D.T.*, we held that the "court must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed. . . ." 239 Mont. at 36, 778 P.2d at 418. We did not establish a shield to protect litigants and their attorneys who engage in discovery abuse from evidence of their transgression just because such evidence was discovered after the document in question was signed. In this case, the discovery abuse occurred at the time Gallagher signed the Defendants' discovery responses and reply brief. The subsequent testimony was simply evidence that the Defendants violated Rule 11, M.R.Civ.P., when the documents were signed, not knowledge gained via the wisdom of hindsight.

¶38 In Franz Kafka's short story *The Trial*, the main character K. was arrested for a crime. *See* Franz Kafka, *The Trial* (Willa & Edwin Muirtran., Schocken Books 1984) (1914). K. did not know of what crime he was accused. K.'s struggle, at least in part, was a result of the fact that he could not discover the necessary information to defend his case. During K.'s first interrogation, the following exchange occurred:

> Emboldened by the mere sound of his own cool words in that strange assembly, K. simply snatched the notebook from the Examining Magistrate and held it up with the tips of his fingers, as if it might soil his hands, by one of the middle pages so that the closely written, blotted, yellow-edged leaves hung down on either side. "These are the Examining Magistrate's records," he said, letting it fall on the table again. "You can continue reading it at your ease, Herr Examining Magistrate, I really don't fear this ledger of yours *though it is a closed book to me . . . .*"

Franz Kafka, *The Trial* 41 (1914) (emphasis added). K.'s attempt to defend himself is, as the Appellants describe it, a "nightmare" because K. is prohibited from accessing information about his case. This is precisely the nightmare discovery rules were developed

to alleviate. The purpose of the Montana Rules of Civil Procedure is to "secure the just, speedy, and inexpensive determination of every action." If anyone in this case is guilty of creating a "Kafkaesque" nightmare, it was the Defendants, who refused to comply with the Rules of Civil Procedure and refused to disclose information necessary for the proper preparation of the Plaintiffs' case.

¶39 As we held in *First Bank (N.A.)-Billings*, "[w]here it is determined that counsel or a party has acted willfully or in bad faith in failing to comply with rules of discovery . . . , it is within the discretion of the trial court to dismiss the action or to render judgment by default . . . ." 219 Mont. at 376, 711 P.2d at 1386. Further, the plain language of Rule 11, M.R.Civ.P., provides that a district court "upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction . . . ." In this case, the District Court found the Defendants "repeatedly and willfully concealed and misrepresented facts" in the course of discovery. The District Court stated:

> The [Defendants'] conduct is inexcusable and they must now suffer the consequences. . . . Incomplete, evasive, or willful abuse of the discovery process calls for the imposition of sanctions under Montana law.

Therefore, we conclude that the District Court did not abuse its discretion when it sanctioned MRC and Navajo Refining pursuant to Rule 11, M.R.Civ.P., by imposing liability as a matter of law. Accordingly, we affirm the judgment of the District Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ JIM REGNIER

1. James Case, a chemical process engineer, who assisted in the design of the HTU defined it as follows: "A hydrotreating unit is a unit which under temperature and pressure takes a hydrocarbon stream that contains excessive sulfur levels and heats it up and adds hydrogen with it and passes it in a down flow

mode through beds of catalyst, and a reaction is promoted by this catalyst which turns some of those sulfur compounds into hydrogen sulfide."