No. 04-574

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 334

_____

WARREN McCONKEY,

        Plaintiff and Appellant,

   v.

FLATHEAD ELECTRIC COOPERATIVE, JAMES
MALONE, and JOHN DOES 1 through 5,

        Defendants and Respondents.

_____

APPEAL FROM:    District Court of the Eleventh Judicial District,
                   In and for the County of Flathead, Cause No. DV 2002-427C
                   The Honorable Stewart E. Stadler, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Patrick G. Frank, Worden Thane P.C., Missoula, Montana

        For Respondent Flathead Electric Cooperative:

        Donald C. Robinson, Ronald A. Thuesen, Poore, Roth & Robinson, P.C.,
        Butte, Montana

        For Respondent James Malone:

        Tiffany B. Lonnevik, Lonnevik Law Firm, P.C., Kalispell, Montana

        Maxon R. Davis, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls,
        Montana

                           _____

                           Submitted on Briefs:  May 3, 2005
                                Decided:  December 20, 2005

Filed:

               _____
                          Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     Warren McConkey (McConkey) appeals from an order of the Eleventh Judicial District, Flathead County, granting Respondents' motions for summary judgment and dismissing all of his claims. We affirm.

¶2     McConkey raises the following issues on appeal:

¶3     1. Did the District Court err in holding that Flathead Electric does not have to pay McConkey 100% of his accrued personal time?

¶4     2. Did the District Court err in ruling as a matter of law that there was good cause for McConkey's discharge?

¶5     3. Did the District Court err in ruling that Flathead Electric did not violate its written personnel policies in discharging McConkey?

¶6     4. Did the District Court err in concluding as a matter of law that Defendant Malone did not libel McConkey?

¶7     5. Did the District Court err in dismissing McConkey's claim for infliction of severe emotional distress?

**BACKGROUND**

¶8     Appellant Warren McConkey was hired as the general manager of Flathead Electric Cooperative (FEC) on March 16, 1988. He held this position until he was terminated on February 13, 2002.

¶9     In 1998, FEC acquired PacifiCorp, an investor owned utility that served the urban areas of northwest Montana. FEC paid $110 million for PacifiCorp and increased its customer base from approximately 12,000 to 55,000 subscribers. As FEC's general manager, McConkey developed the plan to acquire the assets of PacifiCorp. McConkey

2

began to implement his acquisition plan in 1996, although it had been his goal to acquire PacifiCorp since he took over as general manager. McConkey actively campaigned for the acquisition, and it was eventually approved by FEC's Board of Trustees (Board). FEC did not seek member approval. The acquisition was highly leveraged, which had a negative effect on FEC's debt/equity ratio, causing it to be ranked lower for borrowing purposes. Also, following the acquisition, it was discovered that PacifiCorp had misstated revenues on its financial statements, which later contributed to FEC's fiscal problems.

¶10    In 1999, FEC began to experience financial deficits; $2.08 million in 1999 and $1.2 million in 2000. This was a result of several factors, including the leveraged acquisition of PacifiCorp and the rising costs of energy. Concerning the latter, McConkey stated in his deposition that he thought cooperatives would fare well in an open market pricing environment. This was evinced in the power supply contracts McConkey negotiated wherein the per megawatt purchase price was fixed for the first three years, followed by a five-year contract binding FEC to pay a variable rate based upon a market price index. McConkey believed that FEC would benefit from such a contract because electric supply rates would remain stable. In addition, McConkey believed FEC would be able to secure lower supply costs through greater bargaining power after its acquisition of PacifiCorp.

¶11    When FEC's power supply contract switched to open-market pricing, its cost of electrical power increased from approximately $40,000 a month to a high of $840,000 per month. This resulted in revenue deficits that required FEC to increase its electricity rates to its members by 6.9% in April 2000, 29.0% in April 2001, and 12.5% in October

3

2001. These increases were contradictory to what members had been promised. Thereafter, at a cost of $48,000 to $49,000, FEC retained counsel to explore the possibility of filing for bankruptcy protection.

¶12    In August 2001, a special board meeting was held to consider a motion to terminate McConkey as general manager. McConkey's perceived inadequacies and failures were read into the record, in his presence. In addition, a summary of these reasons was prepared by a minority of the members of the Board and presented to McConkey. The motion to terminate McConkey was rejected by a 7 to 5 vote. However, there continued to be controversy over whether McConkey should be retained. McConkey did not accept the criticism from the minority of the Board as something he needed to address in order to keep his job.

¶13    In December 2001, a general manager performance review form was completed by each board member. All parties agreed that the results of this review were conflicting; with the reviews falling along lines similar to that of the August 2001 vote.

¶14    Thereafter, at a meeting on February 13, 2002, the Board voted unanimously to terminate McConkey as general manager. There had been no change in board members since the August 2001 meeting. A letter was delivered to McConkey stating the reasons for his discharge.

¶15    At the time McConkey was terminated he had accrued personal (vacation) time under FEC's policies. He was paid cash for 95% of this accrued personal time.

¶16    James Malone was elected to FEC's Board of Trustees in 2001. Shortly after being elected, Malone made it clear to McConkey that he would work to have him fired as general manager. In April 2001, just after assuming his seat on the Board, Malone

4

began writing letters to local newspapers. These letters are the primary basis for McConkey's defamation claim against Malone. In addition to the letters, there were several advertisements placed in local newspapers regarding McConkey and FEC management, which Malone may have had some part in.

¶17 Following his termination, McConkey filed a complaint seeking damages from FEC for wrongful discharge alleging that he was not terminated for good cause and that FEC violated its written personnel polices. McConkey further sought damages from FEC for failure to pay personal time, that had accrued prior to his termination, at 100% of his salary. McConkey also filed claims against Malone for libel, and infliction of emotional distress.

¶18 The District Court granted FEC's motion for summary judgment and dismissed McConkey's claims against FEC, finding that he was terminated for good cause, FEC did not violate its written personnel policies, and that personal time accumulated by McConkey was not wages pursuant to § 39-3-201(6)(a), MCA. The District Court also granted Malone's motion for summary judgment and dismissed McConkey's libel and emotional distress claims. McConkey appeals.

## STANDARD OF REVIEW

¶19 We review a district court's summary judgment ruling *de novo* and employ the same method of evaluation, based upon Rule 56, M.R.Civ.P., as applied by the district court. *Andrews v. Plum Creek Mfg., LP.*, 2001 MT 94, ¶ 5, 305 Mont. 194, ¶ 5, 27 P.3d 426, ¶ 5. Summary judgment is proper if the record discloses no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Lutey Const. v. State* (1993), 257 Mont. 387, 389, 851 P.2d 1037, 1038. A party seeking summary

5

judgment has the burden of establishing a complete absence of any genuine factual issues. *Howard v. Conlin Furniture No. 2, Inc.* (1995), 272 Mont. 433, 436, 901 P.2d 116, 118. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. *Hanson v. Water Ski Mania Estates*, 2005 MT 47, ¶ 11, 326 Mont. 154, ¶ 11, 108 P.3d 481, ¶ 11. All reasonable inferences that might be drawn from the offered evidence should be drawn in favor of the party opposing summary judgment. *Howard*, 272 Mont. at 437, 901 P.2d at 119.

## DISCUSSION

## ISSUE 1

¶20 **Did the District Court err in holding that Flathead Electric does not have to pay McConkey 100% of his personal time?**

¶21 FEC provides its employees with "personal time," analogous to vacation time, where the objective is "[t]o make available personal time to be used by an employee for vacation, personal illness, personal accident or other personal business." McConkey argues that the District Court erred in holding that his personal time did not qualify as "wages" pursuant to § 39-3-201(6)(a), MCA, and holding that he was thus not entitled to be paid for all such time he accrued at 100%.

¶22 Section 39-3-204(1), MCA, requires that an employer pay its employees "the wages *earned* by the employee . . . ." (emphasis added). The statute further defines "wages," in part, as "any money due an employee from the employer . . . ." Section 39-3-201(6)(a), MCA. Under a plain reading of the statute, the District Court was correct in concluding that the personal time, as a matter of law, does not automatically qualify as

6

"wages." However, to the extent the employer has obligated itself to pay money for earned but unused personal time, there exists an obligation to pay wages under § 39-3-201(6)(a), MCA. Thus, FEC is liable to McConkey for the amount it agreed to pay. *Langager v. Crazy Creek Products, Inc.*, 1998 MT 44, ¶ 25, 287 Mont. 445, ¶ 25, 954 P.2d 1169, ¶ 25 (the employer is obligated to pay that which is earned, due and owing). Here, the parties agree that McConkey earned the relevant personal time. The issue is whether the policy set by FEC, that McConkey would be compensated for earned personal time at 95% of his pay rate, is legal.

¶23    The employer is free to set the terms and conditions of employment and compensation. *Langager*, ¶ 25 (quoting *Rowell v. Jones & Vining Inc*. (Maine 1987), 524 A.2d 1208, 1211). The employee is free to accept or reject those conditions. *Langager*, ¶ 25. Setting a 95% cash value as the conversion of accrued personal time to wages is a reasonable condition of employment. *Cf. Langager*, ¶ 31.

¶24    In *Langager* we held that the employee was entitled to reimbursement for her earned vacation time. *Langager*, ¶ 32. The condition we refused to enforce in *Langager* required the employee to work a scheduled shift immediately after her paid vacation period, and failure to do so resulted in the loss of that vacation pay. *Langager*, ¶ 31. We held that such a condition subsequent was unenforceable as the employee had already earned the vacation pay. *Langager*, ¶ 31. In this case, the 95% reimbursement rate is not a condition subsequent preventing McConkey from earning personal time and later exchanging it for cash. The 95% policy sets the cash value of the benefit when it is earned. Employers are free to negotiate with employees what benefits will be extended and the value of such benefits. *Langager*, ¶ 25. Thus, because FEC had obligated itself,

7

under its agreement with McConkey, to pay cash for only 95% of the personal time he had accrued, the other 5% did not constitute wages that were part of McConkey's agreed compensation. We affirm the District Court's conclusion that the payment of 95% of McConkey's personal time was proper.[1]

## ISSUE 2

¶25 **Did the District Court err in ruling as a matter of law that there was good cause for McConkey's discharge?**

¶26 A discharge is wrongful if it is not for good cause. Section 39-2-904(1)(b), MCA. Good cause includes a legitimate business reason, which we have defined as "a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Buck v. Billings Montana Chevrolet, Inc.,*. (1991), 248 Mont. 276, 281-282, 811 P.2d 537, 540. In applying this definition we stress the importance of the "right of an employer to exercise discretion over who it will employ and keep in employment." *Buck,* 248 Mont. at 282, 811 P.2d at 540. It is inappropriate for courts to become involved in the day-to-day employment decisions of a business. *Buck,* 248 Mont. at 282, 811 P.2d at 541. Further, the discretion we afford employers is at its greatest in cases like this one, where the employee occupies a "sensitive" managerial position exercising "broad discretion," specifically, where the employment relationship is between a company's board of trustees and its general manager. *See Buck,* 248 Mont. at 283, 811 P.2d at 541.

---

[1] McConkey also argues that FEC had created a precedent of paying 100% of personal time to other terminated employees. However, he has not cited any authority supporting the notion that an employer's decision to pay more than it owes to one employee somehow binds the employer to do the same in all instances.

8

¶27    The District Court ruled that as a matter of law FEC had good cause to terminate

McConkey.  In support of its ruling, the District Court stated four reasons evincing good

cause:

> [(1) S]ubsequent to the acquisition of PacifiCorp[, FEC's] debt/equity ratio
> dropped to the low single digits[; (2)] the Bigfork Hydro power supply
> went from a cost of approximately $40,000 a month to a high of $840,000[;
> (3)] in May of 2001,[] FEC retained bankruptcy counsel at the cost of
> approximately $48,000 to $49,000[;] and [(4) FEC], based upon increased
> costs of service, raised electricity rates to consumers [] by 6.9% in April of
> 2000, 29% in April 2001, and 12.5% in October 2001.

The District Court concluded McConkey failed to raise any genuine issues of material

fact that would tend to show the reasons for termination were false, whimsical, arbitrary

or capricious, or that such reasons had no logical relationship to the needs of FEC.

¶28    On appeal, McConkey argues that there are material issues of fact that the District

Court overlooked.  McConkey argues that only one of the four factors listed by the

District Court, the rate increases, corresponds to the termination letter that was sent by

FEC to McConkey stating the reasons he was fired.  As a matter of public policy,

McConkey argues, courts should not consider reasons not given to the employee upon

termination; otherwise employers would be encouraged to give unreasonably vague

justifications for termination and later defend their actions with matters that were not

specifically identified.

¶29    We have stated that generally, in wrongful discharge cases, reasons for discharge

other than those set forth in a discharge letter are irrelevant, and thus inadmissible.

*Galbreath v. Golden Sunlight Mines, Inc.* (1995), 270 Mont. 19, 23, 890 P.2d 382, 385.

We later distinguished *Galbreath*, in *Jarvenpaa v. Glacier Electric Cooperative, Inc.*,

1998 MT 306, 292 Mont. 118, 970 P.2d 84, holding that unlike collateral issues, such as

9

those offered in *Galbreath*, evidence offered to "substantiate the reasons [] already given in [the termination] letter" are admissible. *Jarvenpaa*, ¶ 41.

¶30    In its discharge letter to McConkey, FEC stated, "Decisions made based on your recommendations on wholesale power supply contracts have caused substantial rate increases to members.  These recommendations negatively impacted the Cooperative financially for the years 2000 to 2001."  The District Court did not err in stating FEC's debt/equity ratio, its substantial electric power cost increases from contracts negotiated by McConkey, and the necessity to retain bankruptcy counsel, as reasons for McConkey's termination.  All of these substantiate the negative financial impact, referenced in the termination letter, that FEC suffered as a result of McConkey's activities relating to the acquisition of PacifiCorp.

¶31    McConkey attempts to distinguish this case from the facts in *Buck*, where the employer/defendant had a long history of placing his own employees in management positions within the companies he acquired.  McConkey is correct that there was no such history or practice in employing general managers by FEC.  However, it is the rationale in *Buck* that a general manager has less protection than an employee who makes no policy decisions, that is applicable here. *Buck*, 248 Mont. at 283, 811 P.2d at 541.  Under the present circumstances, where the cause for termination was based upon the faults or errors of the general manager, which in the opinion of the Board caused substantial damage to the company, a board of trustees has broad discretion in determining whether the general manager failed to satisfactorily perform his job.  Such a failure constitutes a legitimate business reason to terminate employment.  To conclude otherwise would involve the courts in the day-to-day employment decisions of a business.  *See Buck,* 248

10

Mont. at 282, 811 P.2d at 541.

¶32    McConkey points out that, at the time of the August 2001 special board meeting, the board members were fully aware of the four reasons later listed by the District Court as constituting good cause to fire him, yet a majority of the members voted to retain him as general manager at that time. McConkey argues that later using the same reasons to justify the unanimous vote to terminate him in February 2002 makes these reasons false, whimsical, arbitrary, and capricious, because the reasons given no longer had a logical relationship to the needs of FEC. What McConkey really argues is that the Board cannot change its mind without further justification. However, McConkey cites no authority for this proposition. Rather, in an attempt to support his argument, McConkey points to the record that indicates several board members stated that McConkey "did not do anything" between the August 2001 meeting and the February 2002 meeting. He argues that such statements show that there were no new reasons to justify a termination vote at the later meeting. However, these statements do not support his argument, it is just as logical to assume that the statements mean the Board fired him because he failed to do anything to fix the problems.

¶33    In a case such as this, where the complaining employee is in an executive position, makes top level policy and strategic decisions, and great trust is placed in his judgment, courts must be cautious in second guessing employment decisions of the company's board. *See Buck,* 248 Mont. at 282-283, 811 P.2d at 541. We decline to do so in this instance where McConkey has failed to raise a genuine issue of material fact that the reasons given for his termination are in fact outside the realm of legitimate business interests.

11

# ISSUE 3

¶34 **Did the District Court err in ruling that Flathead Electric did not violate its written personnel policies in discharging McConkey?**

¶35 FEC had a written policy that related directly to McConkey, stating: "In a case where the General Manager is the subject of disciplinary action, the Board will adopt an appropriate disciplinary procedure." McConkey contends that this policy required "progressive" discipline because it contained the word "procedure." Therefore, he argues, the policy was violated because his termination did not follow a progressive disciplinary procedure. To further support this, McConkey cites to one board member's deposition wherein it was stated that the Board had a progressive disciplinary procedure in place. We conclude, as did the District Court, that because there were no express, specific requirements regarding what constituted an appropriate disciplinary procedure contained in FEC's policy, there was therefore no requirement that the discipline be progressive.

¶36 Section 39-2-904(1)(c), MCA, states that a discharge is wrongful if "the employer violated the express provisions of its own written personnel policy." Contrary to McConkey's argument, the use of the word "procedure" in the FEC policy did not constitute an express requirement that any disciplinary measure taken against the general manager be progressive. We decline to read extraneous statements into FEC's written policy. Regardless of what one board member said about Board procedures, the fact remains that the policy did not expressly state that termination of the general manager required a progressive disciplinary procedure.

¶37    Alternatively, McConkey argues that the Board failed to adopt an "appropriate disciplinary procedure," as is expressly required under the FEC policy.   Again, McConkey cites to the deposition of a single board member to support this.   The board member was asked, "Are you aware of any disciplinary procedure that was adopted by the Board specific to Warren?"  The board member replied, "No."  Notwithstanding this response, we conclude that a disciplinary procedure was adopted by the Board when it held several meetings to consider McConkey's performance and continued employment, put him on paid administrative leave while these discussions progressed, voted to terminate him and then provided him with written notice and justification for the termination.   The Board is given discretion in forming an appropriate disciplinary procedure within the express language of its policy.   McConkey has raised no genuine issue of material fact concerning whether this express, written policy was violated by FEC.

¶38    The second FEC policy McConkey argues was violated stated in part, "Disciplinary actions outlined in this policy may be taken by [FEC] management if an employee . . . demonstrates an inability to meet [FEC] standards of job performance or conduct."  McConkey contends that there is a genuine issue of material fact as to whether he in fact demonstrated an inability to meet the applicable standards of job performance or conduct.  Assuming this policy applied to McConkey, we refer to our discussion above concerning McConkey's managerial failures articulated by the Board.  It follows that in the opinion of the Board, which we decline to second guess, McConkey "demonstrated an inability to meet [FEC] standards of job performance or conduct."   As, under the circumstances of this case, it was the Board's prerogative to make the decision

concerning whether job standards were met, there is no genuine issue of material fact concerning whether the express, written policy was violated.

## ISSUE 4

¶39 **Did the District Court err in concluding as a matter of law that Defendant Malone did not libel McConkey?**

¶40 McConkey claims that Malone defamed him via several writings published primarily in newspapers in the Flathead region. Particularly, McConkey notes a letter written by Malone stating in part:

> This mess is the result of a board of trustees allowing management to exert too much influence into decisions that are entrusted to the board by members of the co-op through the election of trustees. Management has led the co-op through direct actions and through bad recommendations to the board over the last five years into one h[ell] of a mess.

McConkey also alleges that Malone placed ads in a local paper discussing a proposed amendment to FEC bylaws, stating the amendment was:

> [B]rought to you by the same Co-op manager and same faction of board of trustees who:
>
> Are responsible for the mismanagement that resulted in your more than 50 percent electric bill increase.
>
> Approved a salary for the co-op manager of over $140,000 with benefits bringing the compensation package to more than $250,000 annually, an amount double the average of the co-op managers in Montana.
>
> Are responsible for your paying the highest electrical rates in the state and the increase in your basic rate from $6 to $21.
>
> Are responsible for increasing the annual interest paid by the co-op from $1.3 million to $9.1 million.
>
> Are responsible for paying $30 million too much for PacifiCorp.

The ad continued:

14

> The manager wants to change the voting to a mail-in ballot because he believes that a majority of the members do not know that the reason their electric bill increased was largely due to co-op mismanagement. We have the highest Co-op Electrical rates in the state due to mismanagement! This manager knows that informed members who take the time to attend meetings are very likely to vote against his poor management practices. . . . Why would this manager and his faction of rubber-stamped trustees spend over $40,000 to hold a special election two months prior to the regularly scheduled meeting?

¶41 McConkey alleges that these writings were defamatory and false, and seeks damages from Malone for publishing them. The District Court held that the statements were not defamatory and granted summary judgment to Malone.

¶42 Pursuant to § 27-1-802, MCA, defamatory libel is:

> [A] false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule or obloquy or which causes him to be shunned or avoided or which has a tendency to injure him in his occupation.

¶43 McConkey argues that because issues of fact exist as to whether Malone's statements were false and defamatory, the District Court erred in determining the statements were not defamatory libel as a matter of law.

¶44 We conclude that Malone's statements did not carry a defamatory meaning and therefore it is unnecessary to determine whether they were false. In *Hale v. City of Billings*, we stated that "subject to control of the court whenever the issue [of defamation] arises, the jury determines whether . . . the matter was true or false." *Hale v. City of Billings*, 1999 MT 213, ¶ 17, 295 Mont. 495, ¶ 17, 986 P.2d 413, ¶ 17 (quoting Restatement (Second) of Torts § 617). However, we also stated, "[i]n contrast . . . the court, as a preliminary finding, must determine 'whether a communication is capable of bearing a particular meaning; and . . . whether the meaning is defamatory.'" *Hale*, ¶ 17

(quoting Restatement (Second) of Torts § 614). Thus, the threshold test is whether the statements, even if false, are capable of bearing a defamatory meaning. If the alleged statements are not defamatory, it is unnecessary for a jury to decide if they are false.

¶45 The test for defamation is stringent. *Frigon v. Morrison-Maierle, Inc.* (1988), 233 Mont. 113, 121, 760 P.2d 57, 62, *overruled on separate grounds by Sacco v. High Country Independent Press, Inc.* (1995), 271 Mont. 209, 235, 896 P.2d 411, 426. In *Wainman v. Bowler* (1978), 176 Mont. 91, 576 P.2d 268, we stated:

> Defamation words to be actionable . . . must be of such nature that the court can presume as a matter of law that they will tend to disgrace and degrade [the plaintiff] or cause him to be shunned and avoided. It is not sufficient, standing alone, that the language is unpleasant and annoys or irks him, and subjects him to jests or banter, so as to affect his feelings.

*Wainman*, 176 Mont. at 96, 576 P.2d at 271. In *Frigon*, we applied this definition to an employment situation and concluded that as a matter of law an employer's comments directed at areas of the employee's job performance needing improvement were not statements that disgraced or degraded the employee. *Frigon,* 233 Mont. at 121, 760 P.2d at 62. Here, the published statements allegedly made by Malone were merely critical of the performance of FEC, its Board of Trustees, and its management. However, as determined by the District Court, there is no evidence that they disgraced or degraded McConkey, or caused him to be shunned or avoided.

¶46 McConkey argues that the statements injured him in his occupation because he was terminated. However, McConkey has failed to produce evidence that FEC's Board was influenced by alleged defamatory statements.[2] The record contains no statement by

---

[2] This is true of all the alleged defamatory statements that could be misstatements of fact. For example, even if the statement regarding McConkey's salary is false, he fails to show how such a misstatement would tend to degrade or disgrace him; arguing only that he

a board member that he or she voted to terminate McConkey because of the alleged defamatory material. Even McConkey testified at his deposition to the effect that a number of the board members told him that the content of the statements did not influence their votes.

¶47 Further, the District Court correctly concluded that claims of defamatory libel may not be based on innuendo or inference, and that allegedly libelous statements must be aimed specifically at the person claiming injury. *Wainman*, 176 Mont. at 94, 576 P.2d 270 ("If the language is not slanderous per se it cannot be made so by innuendo[.]") (quoting *Keller v. Safeway Stores, Inc.* (1940), 111 Mont. 28, 31-32, 108 P.2d 605, 608). Thus, statements made by Malone regarding FEC as an entity do not constitute libel against McConkey.

¶48 Nor do sarcastic and hyperbolic statements meet the stringent test for defamation. *Burr v. Winnett Times Pub. Co.* (1927), 80 Mont. 70, 77, 258 P. 242, 244 (concluding statements were only sarcasm and thus not libelous). Statements such as "Management has led the co-op . . . into one h[ell] of a mess[,]" are hyperbolic and not actionable. *See Burr*, 80 Mont. at 77, 258 P. at 244.

¶49 Finally, a basic principal in the law of defamation is that an expression of opinion generally does not carry a defamatory meaning and is thus not actionable. *Frigon,* 233 Mont. at 121, 760 P.2d at 62. Here, under the circumstances of this particular case, even if Malone's statements directly accuse McConkey of mismanagement, they are merely

was terminated as a result of the statement is insufficient to show defamation. Further, a misstatement of a general manager's salary is unlikely to influence a board of trustee's decision to terminate him, as surely the board would know the general manager's true salary and use this correct amount in its determination.

17

statements of opinion. *Frigon*, 233 Mont. at 121, 760 P.2d at 62 (citing *Janklow v. Newsweek* (8th Cir., 1985), 759 F.2d 644). For example, the statement that FEC "pa[id] $30 million too much for PacifiCorp[,]" was simply Malone's opinion, not a misstatement of fact, and therefore cannot constitute defamation.

¶50 McConkey argues, however, that under *Hale*, even if Malone's statements regarding mismanagement were opinion, the statements were still defamatory. We held in *Hale*, if the stated opinion does not disclose the facts upon which it is based, and as a result creates the reasonable inference that it is based on defamatory facts, there is no protection for the statement. *Hale,* & 27. However, McConkey has failed to suggest what inferred facts are undisclosed in this case. To the contrary, the publicly disclosed facts concerning FEC's financial problems and rate increases are obvious and disclosed. It is not defamatory to express the opinion that FEC's publicly known financial problems were the result of mismanagement, and that the general manager may have been partially responsible.[3] Therefore, in this case there was no reasonable inference that Malone's opinions were based on undisclosed defamatory facts.

¶51 We conclude that the District Court was correct in its holding that, as a matter of law, McConkey failed to produce any publications bearing a defamatory meaning. Having so held, it is not necessary to proceed further and consider whether McConkey was a limited public figure for purposes of public debate regarding the operation of FEC.

---

[3] The facts from Hale are clearly distinguishable from this case. In *Hale*, Billing=s Police made a public statement claiming that, AIn our *opinion*, we think Mark Hale [plaintiff] is a most wanted fugitive, who may be armed and dangerous.@ *Hale*, & 28. There were no publicly disclosed facts to support the statement; therefore it was reasonable to conclude that the public would have inferred that there were undisclosed facts, known to the police, to support the opinion that Hale was, for example, "armed and dangerous."

¶52 **Did the District Court err in dismissing McConkey's claim for infliction of severe emotional distress?**

¶53 McConkey, as an independent claim for relief against Malone, alleged negligent and intentional infliction of emotional distress. The District Court dismissed this claim, concluding that McConkey's affidavit, which stated that he sought counseling to help him deal with his emotional distress due to the "humiliation" from the "public smear campaign," was insufficient to show severe emotional distress. McConkey argues Malone failed to present any evidence that he did not suffer severe emotional distress.

¶54 It is McConkey's burden to come forth with material and substantial evidence to support his claim. *Hanson*, ¶ 11. Only if he presents evidence sufficient to meet the standard to establish severe emotional distress does the burden shift to Malone to produce contrary evidence. *See Hanson*, ¶ 11.

¶55 The district court must determine whether the plaintiff has produced sufficient evidence to support a prima facie case for infliction of emotional distress. *Sacco v. High Country Independent Press, Inc.* (1995), 271 Mont. 209, 236, 896 P.2d 411, 427. If the evidence produced by McConkey, viewed in a light most favorable to him, is insufficient as a matter of law, his claim must fail.

¶56 In this case, even if McConkey sought counseling to deal with his "loss of self-esteem and self-worth," arguably the result of the public criticism, the District Court did not err in holding that this fact alone is insufficient to establish a claim for emotional distress "so severe that no reasonable [person] could be expected to endure it." *Sacco*, 271 Mont. at 234, 896 P.2d at 426. As discussed throughout this Opinion, McConkey

19

held an executive, managerial position with FEC, a utility company which serves thousands of customers in the area. One holding such a position must be willing to accept some public criticism regarding his or her job performance when rates rise dramatically. Considering the facts as alleged by McConkey, we conclude the mental stress he claims he suffered in this case, caused by the public discourse surrounding his termination, does not rise to that level which a reasonable man, normally constituted, in McConkey's position, would be unable to adequately cope with. *See Sacco*, 271 Mont. at 231, 896 P.2d at 424.

## CONCLUSION

¶57 We affirm the District Court.

/S/ JOHN WARNER

We Concur:

/S/ BRIAN MORRIS
/S/ PATRICIA O. COTTER
/S/ JIM RICE

Chief Justice Gray, specially concurring.

¶ 58 For the most part, I join in the Court's analysis of the issues presented and in the result the Court reaches in this case. I also join in those portions of the Court's opinion on issue 3 which conclude that nothing in FEC's written personnel policies required progressive discipline before McConkey could be discharged, and that McConkey has failed to establish a genuine issue of material fact regarding whether he demonstrated an inability to meet the standards of job performance or conduct.

¶ 59 I write separately to state the basis on which I join the Court's result with regard to McConkey's argument that the Board failed to adopt an appropriate disciplinary procedure for McConkey, as required by FEC's written policies. The Court concludes, in essence, that the Board's acts of terminating McConkey and then providing him with written notice and justification for the termination constituted compliance with the written policy requiring the Board to "adopt an appropriate disciplinary procedure" in a case involving discipline of the general manager. I do not agree.

¶ 60 It is my view that the written policy required the Board to actually adopt an appropriate disciplinary procedure, in the same *manner* as it had *adopted* a progressive disciplinary procedure applicable to its other employees. The procedure clearly was intended to be separate and apart from—and need not be the same as—the procedure for other employees. The Board did not adopt such a procedure, and I would conclude it violated its written policy in that regard.

¶ 61 Under the circumstances of this case, however, I also would conclude that the violation did not provide a basis for a wrongful discharge claim by McConkey, because

he did not raise a genuine issue of material fact that whatever procedure the written policy necessitated would have been required to include more elements than the actions the Board took—which included several meetings between representatives of the Board and McConkey to attempt to resolve what was perceived as paralysis within the FEC, several discussions of the matter at executive sessions of the Board, a vote to terminate at an open Board meeting, notice to McConkey and written justification for the termination.

¶ 62    I realize that all of this may seem a distinction without a difference.  At the bottom line, it is.  I write, however, out of an abundance of caution and concern for future cases.  This case presents facts very different from the ordinary wrongful discharge case, and it is crucial to safeguard the vitality of § 39-2-904(1)(c), MCA, which states that a discharge is wrongful if "the employer violated the express provisions of its own written personnel policy."  It is important that the Court's statements to the effect that the acts of terminating McConkey were the functional equivalent of actually adopting a procedure will not be relied on by employers—or used against terminated employees—in future cases.

/S/ KARLA M. GRAY

22