FILED

03/25/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0478

DA 19-0478

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 65

ELIZABETH A. PUTNAM,

      Plaintiff and Appellant,

  v.

CENTRAL MONTANA MEDICAL CENTER,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DV-14-2017-115
Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Torger Oaas, Attorney at Law, Lewistown, Montana

      For Appellee:

          Brian Sabey, Hall, Render, Killian, Heath and Lyman, P.C.,
Denver, Colorado

Submitted on Briefs:  January 29, 2020

Decided:  March 24, 2020

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Elizabeth Putnam appeals an August 12, 2019 Tenth Judicial District Court order granting Central Montana Medical Center's ("CMMC") motion for summary judgment and denying Putnam's motion for partial summary judgment. We affirm.

¶2      We restate the issues on appeal as follows:

> *Issue One: Whether the District Court erred in concluding that CMMC possessed good cause when it terminated Putnam.*
>
> *Issue Two: Whether the District Court erred in concluding that CMMC discharged Putnam in compliance with its express written policies.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      Between 2004 and 2017, Putnam served as the In-Home Care Services Director for CMMC. Putnam's job responsibilities included management, staffing, and overseeing billing activities of several departments relating to home-based care. Putnam was further tasked with routinely evaluating approximately 36 employees. In 2006, Putnam's annual performance evaluation displayed that she was late with submitting employee evaluations. In October 2007, Putnam received an Employee Counseling Statement indicating high accounts receivable ("AR") figures[1] for three of the departments she was responsible for—Home Health Hospice, In-Home Care, and the Med-Alert Program. This written statement explained that Putnam was expected to understand the billing processes used by her departments and provide weekly oversight to ensure bills were completed in a timely manner. This statement also warned Putnam that

---

[1] AR figures reflect outstanding bills owed.

if she failed to remedy the situation, further disciplinary action would occur "up to and including termination of employment."

¶4  In November 2007, Putnam's annual evaluation indicated that she had not submitted at least four employee evaluations. Consequently, Putnam received a "monitor" rating[2] on her evaluation for "Develops home health and hospice plans." Additionally, then-Chief Nursing Operator Diane Scotten noted on Putnam's evaluation that, given Putnam's overall responsibility to the department, "it's important to be constantly aware of all [departments'] operations including billing and contracts." Putnam's future evaluations continued to reflect that she often missed employee evaluations and was behind on AR.[3]

¶5  Between 2012 and 2016, the outstanding AR amount steadily increased. Putnam was repeatedly notified of this issue. In July 2012, accounting firm Eide Bailey audited CMMC's financials, determining that approximately $80,000 in outstanding bills would have to be written off as a result of Putnam's prolonged failure to gather the requisite documentation and comply with billing requirements for certain bills. In March 2015, the AR amount for Home Health/Hospice was $311,002.26. By May 2017, the outstanding Home Health/Hospice AR totaled $809,115.58.

¶6  Beginning in December 2014, to remedy the persistent AR problem, CMMC's CFO Alan Aldrich began sending Putnam emails. These emails were accompanied by an

---

[2] A "monitor" rating falls between a "meets or exceeds" standard and "unacceptable."

[3] Putnam's 2007, 2008, and 2011 evaluations all showed that AR continued to be a problem. Putnam's 2011, 2013, and 2014 evaluations also indicated that she was behind on employee evaluations.

"Accounts Receivable Analysis," detailing CMMC's collection efforts and highlighting areas for improvement.[4] Timely billing of Home Health/Hospice was consistently highlighted as one such area for improvement. Beginning in March 2015 and continuing until June 2017, Aldrich began including a statistic in the analysis tracking CMMC's "AR Days"—the average number of days that accounts sit waiting to be paid down. Between November 2016 and June 2017, despite a company goal to reduce the average number of AR days to 68, average AR days remained above 100.[5]

¶7 In November 2016, a meeting was held to address the high AR amount. Putnam remembered expressing her opinion during the meeting that more steps were needed to adequately address the AR problem. Putnam admitted that she was the person in the main leadership role with respect to this issue. One conclusion from the meeting was that a fellow employee would assume some of her job duties to free Putnam up "to work on the harder to solve items."

¶8 On June 29, 2017, Putnam was absent from a manager's meeting. Although Putnam admitted that these meetings were important to attend, and that department heads should carefully read the minutes upon missing a meeting, Putnam never read the meeting minutes. On June 30, 2017, Putnam met with her supervisor Karin White and new HR manager Carey Darlington to discuss an employee's exit interview which included harassment allegations against Putnam, as well as Putnam's poor meeting

[4] Putnam acknowledged in a deposition that these areas for improvement were meant to signify that she address these problems, admitting that "[the AR figures] were not in compliance with expectation."

[5] The AR days at the end of the last full month prior to Putnam's termination was 128.66.

4

attendance and timeliness of employee evaluations. White and Darlington presented Putnam with a Performance Action Plan to address her attendance and delinquent employee evaluations, giving her until July 31, 2017, to rectify her outstanding evaluations.

¶9 On July 5, 2017, Mike Dowdy, CMMC's CEO, emailed White and Putnam seeking a report on the "lagging HH/Hospital Billing/Catch-up." White replied to all: "Beth, I'll let you speak to this." Putnam replied only to White with a single word: "done." White did not understand Putnam's response and replied back: "What does done mean? Is there a meeting and do we need to be on that call." Putnam did not reply to White. On July 7, 2017, White encountered Putnam and explained that her email response was inadequate. White also questioned whether Putnam understood the seriousness of the situation and told Putnam that she was "hanging by a thread."

¶10 On July 13, 2017, Martin, White, Aldrich, and Darlington met to discuss Putnam's responsibility and history related to charges and billing. After Martin left the meeting, Darlington, Aldrich, and White concluded there were adequate grounds for Putnam's immediate dismissal but agreed to defer the decision to CEO Dowdy. The next day, Dowdy terminated Putnam. The termination form listed four reasons for the termination: "Unsatisfactory Performance," "Neglecting job duties and responsibilities," "Discourtesy or rudeness in dealing with CMMC employees," and "Intentionally discriminating

against employees in violation of applicable laws and/or engaging in harassment of any employee."[6] Putnam read and signed the termination form.

¶11 On November 15, 2017, Putnam filed a Complaint and Jury Demand in District Court, alleging wrongful termination against CMMC. On May 8, 2018, Putnam filed her Third Amended Complaint and Jury Demand, further alleging that CMMC violated § 39-2-904(1)(b) and (c), MCA, of the Wrongful Discharge from Employment Act ("WDEA") when she was terminated because she was not first issued a written warning. On April 8, 2019, Putnam filed a motion for partial summary judgment on the issue of liability for wrongful discharge. On May 2, 2019, CMMC filed a cross-motion for summary judgment. On August 12, 2019, the District Court issued its order on cross-motions for summary judgment, denying Putnam's motion and granting CMMC's motion. Putnam appeals.

## STANDARD OF REVIEW

¶12 We review a district court's grant or denial of summary judgment de novo, using the same standards as the district court under M. R. Civ. P. 56. *McClue v. Safeco Ins. Co.*, 2015 MT 222, ¶ 8, 380 Mont. 204, 354 P.3d 604. Summary judgment is an extreme remedy which should not be a substitute for a trial on the merits if a material factual controversy exists. *Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 13, 345 Mont. 368, 191 P.3d 435. If the moving party can demonstrate no genuine issues of material fact exist and entitlement to judgment as a matter of law, the burden then shifts to the

---

[6] Two of the reasons, "Discourtesy" and "Intentional Discrimination," were not relied upon by CMMC at the time of summary judgment or on appeal because they involved disputed facts.

nonmoving party to prove, by more than mere denial or speculation, that a genuine factual issue does exist. *McConkey v. Flathead Elec. Coop.*, 2005 MT 334, ¶ 19, 330 Mont. 48, 125 P.3d 1121. The party opposing the motion for summary judgment cannot rely on mere allegations in the pleadings but must present evidence raising genuine issues of material fact in the form of affidavits or other sworn testimony. *Arnold v. Yellowstone Mountain Club, LLC,* 2004 MT 284, ¶ 14, 323 Mont. 295, 100 P.3d 137. On cross-motions for summary judgment, the district court, and consequently this Court, must evaluate each party's motion on its own merits. *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2017 MT 246, ¶ 7, 389 Mont. 48, 403 P.3d 664.

## DISCUSSION

¶13 *Issue One: Whether the District Court erred in concluding that CMMC possessed good cause when it terminated Putnam.*

¶14 In denying Putnam's motion for partial summary judgment and granting CMMC's motion for summary judgment, the District Court determined CMMC had good cause to terminate Putnam. Putnam does not contest that she occupied a managerial position, nor does she contest that CMMC legitimately lost trust and confidence in her abilities. Instead, Putnam argues that the reasons for her discharge violated the WDEA because she presented exhaustive evidence demonstrating that the reasons for her termination were false, whimsical, arbitrary and capricious. Conversely, CMMC argues that loss of trust and confidence in a managerial employee alone constitutes good cause under the WDEA sufficient to lawfully discharge that employee.

7

¶15 Section 39-2-904(1)(b), MCA, of the WDEA provides that a discharge is wrongful if it is not for good cause. "Good cause" is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reasons." Section 39-2-903(5), MCA. A legitimate business reason is one "that is not false, whimsical, arbitrary, or capricious, and one that must have some logical relationship to the needs of the business." *Bird v. Cascade Cnty.*, 2016 MT 345, ¶ 11, 386 Mont. 69, 386 P.3d 602 (citing *Davis v. State*, 2015 MT 264, ¶ 10, 381 Mont. 59, 357 P.3d 320). In applying this definition, it is important to consider an employer's right to exercise discretion over whom it employs and keeps in employment. *Bird*, ¶ 12. This Court has long recognized that employers are afforded the greatest discretion where an employee occupies a "sensitive" managerial position and exercises "broad discretion" in her job duties. *Sullivan v. Cont'l Constr. of Mont., LLC*, 2013 MT 106, ¶ 18, 370 Mont. 8, 299 P.3d 832; *Baumgart v. State*, 2014 MT 194, ¶ 39, 376 Mont. 1, 332 P.3d 225; *Moe v. Butte-Silver Bow Cnty.*, 2016 MT 103, ¶ 54, 383 Mont. 297, 371 P.3d 415. In such instances, we have warned against courts intruding in the day-to-day employment decisions of a business with concerns of its management. *Sullivan*, ¶ 18.

¶16 As a cursory matter, Putnam and CMMC disagree as to the level of discretion this Court affords businesses in the employment and termination of its managerial employees. CMMC maintains, relying on *McConkey, Sullivan, Bird*, and *Buck v. Billings Mont. Chevrolet, Inc.*, 248 Mont. 276, 811 P.2d 537 (1991), that leadership's loss of trust and confidence in a managerial employee is a legitimate business reason, in and of itself,

8

constituting good cause sufficient for termination. Putnam, citing to *Moe*, *Guertin v. Moody's Mkt.*, 265 Mont. 61, 874 P.2d 710 (1994), and *Howard v. Conlin Furniture No. 2*, 272 Mont. 433, 901 P.2d 116 (1995), argues that managerial employees may still defeat an employer's motion for summary judgment as to whether an employer had good cause to terminate an employee by submitting detailed, specific evidence demonstrating that the employer's reasons for the termination were false, arbitrary, whimsical, and otherwise did not bear a logical relationship between the employment and the needs of the business. We first address the appropriate standard for granting summary judgment to employers for the termination of managerial employees before analyzing each party's substantive claims.

¶17 Although an employer has the broadest discretion in handling managerial employees, this discretion is not absolute. *Moe*, ¶ 57. When deciding the issue as to whether an employee's discharge was for good cause, the employer must still present evidence of a reasonable job-related ground for the dismissal, including a legitimate business reason. *Moe*, ¶ 50; *Becker*, ¶ 24. Thus, the reason for the dismissal must bear some logical relationship to the needs of the business. *Davis*, ¶ 10. On a M. R. Civ. P. 56 record, upon an employer setting forth evidence demonstrating good cause for the discharge, the burden shifts to the employee to present evidence establishing either that "the given reason for the discharge is not good cause in and of itself, or that the given reason is a pretext and not the honest reason for the discharge." *Bird*, ¶ 11 (citing *Becker*, ¶ 24).

¶18    In *Buck*, F.S. Enterprises, located in Louisiana, purchased a car dealership, Frontier Chevrolet, in Billings, Montana, from James Buck's father-in-law, Andy Anderson, the controlling shareholder in Frontier. *Buck*, 248 Mont. at 279, 811 P.2d at 539. At the time of the purchase, Buck was employed as the general manager of Frontier. *Buck*, 248 Mont. at 279, 811 P.2d at 539. After purchasing the dealership, F.S. Enterprises terminated Buck and replaced him with its own trusted manager, even though there was no failure on Buck's part to satisfactorily perform his job duties nor was there any allegation that he disrupted the employer's operation. *Buck*, 248 Mont. at 280, 811 P.2d at 539. Buck filed suit and the district court granted summary judgment for F.S. Enterprises and Billings Montana Chevrolet, finding that the reason for Buck's discharge constituted a legitimate business reason under the WDEA. *Buck*, 248 Mont. at 278, 811 P.2d at 538.

¶19    This Court determined that Buck's termination was a legitimate business reason *not* because of F.S. Enterprise's loss of trust and confidence in Buck, as CMMC suggests, but rather, because F.S. Enterprises, as the controlling shareholder, had a longstanding policy of buying dealerships and placing a long-term employee, in whom it had great trust, to manage its investment. *Buck*, 248 Mont. at 282, 811 P.2d at 541. Such an arrangement was preferred because it allowed F.S. Enterprises, located in Louisiana, to occupy the management position with someone who held the same business values and philosophies as itself. *Buck*, 248 Mont. at 282, 811 P.2d at 541. We held that "It would be against common sense and rationality for this Court to hold that such reasons or grounds do not constitute a legitimate business reason and are not related to the job

10

involved." *Buck*, 248 Mont. at 282, 811 P.2d at 541. Because Buck did not provide any evidence demonstrating that the given reasons for the termination were false or made in bad faith, we held that the district court properly granted summary judgment. *Buck*, 248 Mont. at 283, 811 P.2d at 541.

¶20 This Court has continued to follow *Buck* precedent, recognizing that an employer is entitled to summary judgment if it presents evidence of reasonable, job-related grounds for the termination and the employee fails to submit evidence that the given reason is a pretext and not the honest reason for the discharge. *See, e.g.*, *McConkey*, ¶¶ 31-33 (holding that a general manager's faults and errors, causing a company's board of directors to believe that the errors caused substantial harm to the company, constituted a legitimate business reason warranting summary judgment when the employee failed to raise genuine issues of material fact that the reason given for the termination was merely a pretext and not the honest reason); *Baumgart*, ¶ 36 (holding that summary judgment was proper and the Department of Commerce ("DOC") had good cause to terminate an employee because the DOC presented direct evidence that the employee failed to appropriately manage her budget and the defendant did not submit evidence to challenge the existence of budget problems); *Sullivan*, ¶¶ 24-27 (holding that an out-of-state company's lack of daily oversight over a managerial employee and that employee's failure to fulfill his job requirements or act in a trustworthy manner constituted a legitimate business reason to terminate employment, and summary judgment was proper because the employee failed to submit evidence that the given reasons for the termination were false, arbitrary, or whimsical).

¶21 Most recently, in *Bird*, we held that a Board of County Commissioners' loss of trust in its Human Resources Director's ability to handle sensitive personnel matters, work collaboratively to resolve workplace concerns, and handle key aspects of the managerial position in accordance with applicable law and policy constituted good cause for her termination. *Bird*, ¶¶ 23-24. The cases on which Putnam relies—*Moe, Howard, and Guertin*—are not inapposite to *Bird* and its predecessors; on a motion for summary judgment, an employer of a managerial employee must still set forth reasons for the termination logically related to the needs of the business. *Moe*, ¶ 49; *see also Howard*, 272 Mont. at 438-40, 901 P.2d at 119-21. Summary judgment is proper if the employee fails to provide evidence, beyond mere speculation, that the given reasons for the termination are a pretext and not the honest reason. *Becker*, ¶ 24.

¶22 In support of its motion for summary judgment, CMMC offered extensive evidence to the District Court of reasonable, job-related grounds for the dismissal bearing a logical relationship to the needs of the business. Over nearly a decade, Putnam struggled to manage rising AR figures and submit timely employee evaluations despite repeated verbal and written warnings from her supervisors. It is clear, based on her deposition and affidavits, Putnam recognized her own duties and responsibilities regarding these areas and failed to rectify these problems.

¶23 In fact, Putnam admits that the AR figures were steadily rising and that she was "sometimes tardy with her employee evaluation." Putnam contends, however, that these reasons were not legitimate business reasons. Instead, Putnam argues that she provided "literally overwhelming evidence" to the District Court that the AR problem was a result

of a failure by CMMC to properly fund her department or provide adequate staffing and that she was feverishly working to solve the problem in the months before her termination. Additionally, Putnam claims that she raised a material factual dispute as to whether CMMC was required to allow Putnam until July 31, 2018, to catch up on her employee evaluations. Putnam asserts that because she was terminated prior to this date, it shows that CMMC's given reasons for her discharge were merely a pretext and not the honest reason, akin to the same factual record as that in *Moe*.

¶24 In *Moe*, Butte-Silver Bow County Human Resources Director Lindsey Moe was fired in 2013 after four years on the job. *Moe,* ¶ 10. Prior to her termination, Moe was placed on administrative leave while the County conducted a fact-finding investigative report as a result of employee complaints against her. *Moe*, ¶ 5. Ultimately, Moe was discharged and provided with written notice of her termination. *Moe*, ¶ 10. Moe filed a complaint in district court against the County for wrongful termination. *Moe*, ¶ 11. On cross-motions for summary judgment, the district court denied the County's motion and held that factual questions remained as to whether the County had good cause for Moe's termination. *Moe*, ¶ 12. We affirmed the district court's denial of summary judgment on the issue of good cause because: (1) Moe had never been disciplined prior to administrative leave and was placed on leave only two weeks after first being notified of problems in her department; (2) she submitted detailed, exhaustive written responses to the County's fact-finding investigative report in which she took issue with nearly all the allegations against her; and (3) she refuted the existence of persistent problems in her

department and never acknowledged a lack of understanding of any job duty or responsibility. *Moe*, ¶¶ 59, 61-62.

¶25 Putnam's attempt to analogize the facts in this case with those in *Moe* is unpersuasive. Here, unlike *Moe*, Putnam received written notice as far back as 2007 regarding the need to update the outstanding AR figures, and as early as 2006 concerning the need to address late employee evaluations. Putnam was notified of these recurrent problems throughout her employment through meetings, emails from CFO Aldrich, and annual employment evaluations. Also, unlike in *Moe*, Putnam was notified both in writing and in person that a failure to address these problems could result in her termination well before she was dismissed.

¶26 Furthermore, while Moe submitted detailed, exhaustive responses to the district court challenging nearly all of the County's allegations, Putnam admits that the outstanding AR amount continued to be a problem throughout her employment, that she was "sometimes tardy" with employee evaluations, and that CMMC legitimately lost trust and confidence in her abilities. Putnam's argument that CMMC's given reasons were merely a pretext because her department was underfunded and because she was not given until July 31, 2017, to complete employee evaluations amounts to mere speculation and does not negate the factual record reflecting the high AR amounts or outstanding employee evaluations. Summary judgment remains an appropriate remedy where there are facts not in dispute that provide "good cause" for discharge from employment. *Davis*, ¶ 14; *Becker*, ¶ 30.

14

¶27 CMMC presented sufficient, credible evidence demonstrating Putnam's inability to manage the high AR figures and employee evaluations such that the reasons for her termination were legitimate business reasons constituting good cause. Putnam failed to submit evidence creating a dispute as to any material fact that these reasons were false, whimsical, or merely a pretext. The District Court did not err in granting summary judgment for CMMC.

¶28 *Issue Two: Whether the District Court erred in concluding that CMMC discharged Putnam in compliance with its express written policies.*

¶29 Putnam further argues that CMMC violated its express written policies such that her dismissal was wrongful. Putnam argues that CMMC's employee handbook mandates that an employee receive a written warning prior to being terminated. Although Putnam admits that she received a written warning in 2007 concerning the AR problem, she argues that the time between when she received this warning and when she was terminated 10 years later exceeded the timeframe allowed by CMMC's handbook. Putnam further maintains that CMMC violated its handbook because she did not first receive a written warning for two reasons given for her termination, "Discourtesy" and "Intentional Discrimination."

¶30 A discharge is wrongful if "the employer violated the express provisions of its own written personnel policy." Section 39-2-904(1)(c), MCA. Section XV of CMMC's employee handbook reads in pertinent part,

> Discipline will be administered at the discretion of the company based on the circumstances of the situation and may involve verbal warning, written warning, suspension, and/or termination. CMMC reserves the right to skip

15

or repeat any of the disciplinary steps at its discretion. In some cases, discharge may be a first step imposed by CMMC.

In addition, this section provides that "Violation of any of the following performance standards may result in disciplinary action and/or immediate discharge: unsatisfactory performance; failure or refusal to follow the written or oral instructions of a supervisor or manager; insubordination; neglecting job duties and responsibilities." The handbook further provides, "Except as noted, termination will not be made without one written warning."

¶31 Contrary to Putnam's argument, CMMC's handbook does not require that an employee receive a written warning prior to termination, but rather, reserves the right to skip disciplinary steps and terminate an employee at its discretion, including for unsatisfactory performance and neglecting job duties. The provision on which Putnam relies, requiring that "termination will not be made without one written warning," is expressly preceded by the language "Except as noted," reserving in CMMC the right to terminate an employee in certain circumstances without written notice. There is also no provision in CMMC's handbook that requires an employee first receive a written warning for every reason listed in a termination notice.

¶32 In addition, Putnam received at least one written warning, in 2007, prior to her termination. There is no provision in CMMC's handbook that mandates a time limit between when a warning is issued and when termination may occur; the fact that Putnam received a formal written warning ten years prior to her termination is adequate to constitute written notice. Putnam also arguably received additional written warnings via

16

employee evaluations and emails from CFO Aldrich regarding the need to complete her evaluations and keep up on the AR figures. There is no genuine issue of material fact concerning whether CMMC violated its express written policies when terminating Putnam. The District Court did not err in granting summary judgment for CMMC.

## CONCLUSION

¶33 The District Court did not err in determining that CMMC terminated Putnam's employment for good cause. The District Court also did not err in concluding that CMMC did not violate its express written policies when it terminated Putnam. There was no dispute as to any material fact and CMMC was entitled to judgment as a matter of law.

¶34 Affirmed.

/S/ BETH BAKER

We Concur:

/S/ JIM RICE
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR

17