DA 13-0034

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 367

THURSTON "SONNY" HARRELL,

      Plaintiff and Appellee,

  v.

THE FARMERS EDUCATIONAL
COOPERATIVE UNION OF
AMERICA, MONTANA DIVISION
and ALAN MERRILL,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Eighth Judicial District,
                  In and For the County of Cascade, Cause No. ADV 11-0212
                  Honorable Thomas M. McKittrick, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Antonia P. Marra; Sara R. Sexe; Marra, Sexe, Evenson & Bell, P.C.;
                Great Falls, Montana

        For Appellee:

                Elizabeth A. Best; Best Law Offices, P.C.; Great Falls, Montana

                Lawrence A. Anderson; Attorney at Law, P.C.; Great Falls, Montana

                           Submitted on Briefs:  August 28, 2013
                                  Decided:  December 10, 2013

Filed:

                _____
                            Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1　The Farmers Educational Cooperative Union of America, Montana Division, commonly known as the Montana Farmers Union (MFU), and Alan Merrill, MFU's president, appeal a jury verdict from the Eighth Judicial District Court, Cascade County, against MFU for wage claims and constructive discharge, and against Merrill individually for interference with Thurston "Sonny" Harrell's employment relationship. The jury awarded Harrell compensatory and punitive damages.

¶2　We restate the issues as follows:

¶3　*1. Whether the District Court erred in denying summary judgment on Harrell's wage claims.*

¶4　*2. Whether the District Court erred in denying judgment as a matter of law on Harrell's claim against Merrill individually.*

¶5　*3. Whether MFU is entitled to a new trial on Harrell's constructive discharge claim.*

¶6　*4. Whether punitive damages properly were awarded against MFU.*

¶7　We reverse in part, affirm in part, and remand for application of the statutory limit to the punitive damages award.

## FACTUAL AND PROCEDURAL BACKGROUND

¶8　Harrell spent many years working for MFU, a farm organization that manages educational programs, youth camps, and lobbying efforts directed toward benefitting the rural farming community.  MFU originally hired Harrell as the membership director.  He

2

left this position after five years and temporarily moved to Alabama. MFU rehired him as the education director when he returned to Montana in October 2006. Merrill became MFU's president shortly after Harrell rejoined MFU.

¶9    MFU initially classified Harrell's education director position as "exempt," meaning he was unable to claim overtime pay but earned compensatory time instead. Beginning in April 2010, when an independent accounting firm began handling its payroll, MFU paid Harrell overtime at one and one-half times his hourly pay in any week that he worked over 40 hours. Harrell did not discover the alleged error in his original classification until December 2010, at which time he began requesting that MFU retroactively pay him for all the overtime hours he had worked over the past few years. MFU steadfastly refused and later provided Harrell with a new job description, which was unchanged except that it reflected that the position was now non-exempt.

¶10    Meanwhile, another dispute arose between MFU and Harrell regarding vacation hours. MFU's employee handbook limits the maximum number of vacation hours that an employee can accumulate by permitting employees to accrue only up to "the amount of leave they would earn in 18 months at their current rate of accrual." Instead of using his vacation hours to take time off from work, Harrell had allowed his vacation time to accumulate, anticipating that he would receive payment for the hours upon his retirement. He eventually accrued more hours than permitted by the handbook. On April 30, 2010, MFU notified Harrell that it would not pay him for all the hours of his accrued vacation

time since 2007 and subtracted the excess hours from his timesheets. When Harrell asked for reinstatement of and payment for the excess vacation, MFU explained that he was not allowed to earn more vacation hours than the capped amount stated in the MFU handbook.

¶11 Harrell also claimed he was owed wages for performing "extra duties." In 2007, after MFU's executive director Tracy Houck resigned, MFU's management assigned Harrell some of the tasks she previously performed. Harrell estimated that these tasks required one hour of work per day. Harrell testified that Merrill took over some of Houck's tasks as well, such as serving as the liaison between the staff and the board of directors and reviewing budget allocations. As president, Merrill remained in charge of the office, or "at the top of the pyramid," and all staff reported to him. Merrill assumed the role of managing MFU's day-to-day business and its employees. Harrell repeatedly requested that MFU pay him for doing tasks outside his job description, but MFU did not fill the executive director position or pay Harrell more for assuming the excess workload.

¶12 Merrill wrote a letter to Harrell in February 2011, explaining that MFU's board had determined that Harrell had not performed certain obligations of his position. Shortly after, MFU cut Harrell from full-time to part-time and issued him a new job description that contained substantially the same duties that he already had been performing. MFU explained that its decision to make the education director position part-time was based on

4

the board's understanding that the job duties Harrell actually performed no longer required a full-time position.

¶13   Harrell filed a complaint in the District Court on March 4, 2011. Harrell alleged that he had been classified incorrectly as exempt and that he was thus entitled to 422 hours of overtime pay and penalties. The complaint also alleged that MFU owed him over $4000 for 232.47 vacation hours earned and not paid. Harrell claimed that MFU failed to compensate him for the additional duties he took on after the executive director left. Harrell claimed that Merrill personally interfered with Harrell's contractual or business relations with MFU by making false statements about him to the Board of Directors. Harrell also raised several other claims against Merrill individually based on these same allegations, but dismissed them during trial.

¶14   MFU responded that its decision to make the education director position part-time was not retaliatory, but that Harrell's failure to accomplish tasks assigned to him left him with less to do. MFU based its decision on Harrell's own reports, his letters refusing to do what he was asked by the board, and his opposition to assigned tasks or his failure to complete them in a timely manner. MFU contended that Harrell's position as education director was intended to be an exempt position because it required substantial discretion, such as designing education programs, determining which grants to request, and seasonally supervising other staff to complete the education and camp work. MFU claimed that the education director position was made a non-exempt position when it was

determined that Harrell's performance of the position had fewer supervisory responsibilities, in part because of a diminution in educational programs. MFU argued that Harrell was not owed any wages, as he worked no overtime for which he had not already been paid as a nonexempt employee, and that he was not entitled to overtime for the period that he was designated as exempt. With regard to the interference with contract claim, MFU argued that the board had the right to ask Merrill about Harrell's work performance and Merrill had the right and duty to inform the board of his opinion. MFU further claimed that Harrell was not entitled to additional vacation pay because he could not accrue more vacation time than the handbook allowed, and no provision in the handbook provided for payment of vacation in lieu of taking the vacation time except upon resignation or termination. Finally, MFU argued that all of Harrell's claims made pursuant to Montana's wage statutes were barred by the applicable statute of limitations.

¶15 On April 29, 2011, Harrell resigned his employment and amended his complaint to allege constructive discharge under the Wrongful Discharge from Employment Act (WDEA). Harrell alleged that he was forced to quit because MFU increased hostility toward him in the workplace and ostracized him after he asserted his right to be paid for vacation, extra duties, and overtime. MFU also denied this additional claim, maintaining that it paid all of Harrell's remaining wages after his voluntary resignation.

¶16 MFU filed a motion for summary judgment on all claims on July 16, 2012. The District Court denied MFU's motion in a one-sentence order. Before trial, MFU filed a

motion in limine seeking to prevent Harrell from introducing evidence concerning a previous case brought by a former employee against MFU. That employee, Katie Kassmier, had alleged constructive discharge based on alleged sexual harassment; she settled her claim in 2007 while represented by the same attorney now representing Harrell.

¶17    During the *Kassmier* case, Harrell wrote a memo—introduced by MFU during Harrell's trial—to the MFU executive committee outlining his concerns regarding what he perceived to be sexually discriminatory policies that could bear adversely upon MFU in the *Kassmier* case. While Harrell's direct involvement in that case was limited, MFU did ask Harrell to draft an affidavit supporting its defense. Harrell's initial affidavit, while helpful to MFU, omitted what he believed to be some essential information. On August 13, 2010, Harrell signed a second affidavit that rendered the first affidavit useless to MFU. MFU later entered a confidential settlement following mediation with Kassmier. Harrell claimed that MFU's response to this second affidavit further contributed to an intolerable work environment.

¶18    The court had reserved ruling on the motion in limine when the trial started. Over MFU's objections, the District Court allowed Harrell's counsel to discuss the *Kassmier* case during her opening statement and to introduce evidence regarding the prior case throughout the trial. Despite expressly avowing to the judge that "I don't want to try to get that in," Harrell's counsel brought the confidential settlement to the attention of the

jury several times, asking one MFU employee, "[Y]ou wouldn't have agreed to pay north of six figures if you didn't think there was risk . . . ?" and asking another, "You wouldn't have paid money if it wasn't meritorious, right?" These references prompted MFU to move for a mistrial, which the District Court denied.

¶19 MFU's counsel also referenced the *Kassmier* case repeatedly, explaining that they believed they had no choice but to defend against the evidence once it was introduced. MFU denied the sexual harassment allegations involving Kassmier, told the jury in its opening statement that the Human Rights Bureau found no cause to think there was any sexual discrimination against Kassmier, and introduced evidence pertaining to the *Kassmier* case during the trial.

¶20 The jury returned a special verdict form in all respects favorable to Harrell. The jury found that MFU failed to pay Harrell for overtime, for vacation, and for his work handling the duties formerly assigned to the executive director. The jury found that Merrill interfered with Harrell's employment relationship with MFU and awarded tort damages against Merrill in the amount of $85,000 for resulting pain and suffering, harm to the ability to enjoy life, and the loss of established course of life. The jury also found that MFU constructively discharged Harrell because he refused to violate the law regarding payment of wages and overtime. It awarded $90,000 in damages for wrongful termination. The total compensatory award was $232,439.40. The jury determined that

punitive damages were appropriate and the court scheduled a separate hearing on the issue.

¶21 The *Kassmier* issue reached its apex when Harrell's counsel mentioned the amount of the settlement during her final summation on punitive damages, stating, "Well, when it was Katie Kassmier's turn, [MFU] had $200,000. You heard Mr. Schlepp tell you that, two hundred thousand bucks that they had to pay her." Mr. Schlepp had denied remembering the Kassmier settlement amount on the witness stand, and the court had overruled MFU's objection to questions about the settlement. Harrell's counsel also stated, "We know that for them $200,000 is a drop in the bucket."

¶22 The jury returned a punitive damages verdict of $300,000. The District Court denied MFU's request to apply the three percent limit to the punitive damages award imposed by § 27-1-220(3), MCA, ruling that the Defendants waived the right to present evidence of net worth by not offering that evidence during the punitive damages phase of the trial. Pursuant to the provision for attorney's fees in the wage claim statutes, § 39-3-214, MCA, the District Court also assessed attorney's fees against MFU after the trial. Defendants appealed, alleging many issues of substantial error.

**STANDARD OF REVIEW**

¶23 We review a district court's decision on a motion for summary judgment de novo. *Jensen v. State*, 2009 MT 246, ¶ 6, 351 Mont. 443, 214 P.3d 1227. A motion for summary judgment shall be granted if "the pleadings, the discovery and disclosure

9

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c).

¶24 This Court reviews a district court's evidentiary rulings "to determine whether the court abused its discretion." *Faulconbridge v. State*, 2006 MT 198, ¶ 22, 333 Mont. 186, 142 P.3d 777. "A district court abuses its discretion only if it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason." *Faulconbridge*, ¶ 22. We also review for abuse of discretion a district court's decision to deny a motion for a mistrial. *Heidt v. Argani*, 2009 MT 267, ¶ 10, 352 Mont. 86, 214 P.3d 1255. The decision depends on "whether the party has been denied a fair and impartial trial." *Heidt*, ¶ 10.

¶25 "We review a district court's conclusions on questions of law to determine if those conclusions are correct." *Ammondson v. Northwestern Corp.*, 2009 MT 331, ¶ 29, 353 Mont. 28, 220 P.3d 1.

## DISCUSSION

¶26 *1. Whether the District Court erred in denying summary judgment on Harrell's wage claims.*

¶27 Harrell set forth three wage claims under the Wage Protection Act, § 39-3-201 et seq., MCA. The wage claims involved his overtime pay, vacation hours, and the "extra duties" he assumed in the absence of an executive director. We conclude that the District Court should have granted summary judgment for MFU on all three claims.

10

*a.*     *Limitations Period*

¶28     Section 39-3-207(1), MCA, requires an employee to file a complaint for wages and penalties within 180 days of default or delay in the payment in wages. "[A] wage claim under § 39-3-207, MCA, accrues when the employer's duty to pay the employee matures and the employer fails to pay the employee." *Jensen*, ¶ 11. "[W]here an employer continually fails to comport with Montana's wage laws on a monthly basis, the employee's wage claims accrue on a monthly basis." *Craver v. Waste Mgt. Partners of Bozeman*, 265 Mont. 37, 45, 874 P.2d 1, 5 (1994), *overruled in part on other grounds*, *In re Estate of Lande*, 1999 MT 179, ¶ 15, 295 Mont. 277, 983 P.2d 316. Failing to pay wages due in past months when the employer has begun paying wages again for each current month, however, does not prevent the clock on the statute of limitations from starting.

¶29     The claim accrues—and the clock begins to run—on the last date on which the employer fails to pay. *Jensen*, ¶ 11. In *Jensen*, we applied the rule from *Craver* where an employee's affidavit stated that the last date on which the employer failed to pay overtime was June 20, 2007, when the employee was reclassified as non-exempt and thus entitled to overtime. *Jensen*, ¶ 11. The employer paid overtime from that date until the complaint was filed on February 19, 2008. *Jensen*, ¶ 4. Because the employee did not file his wage complaint within 180 days after the last date on which the employer failed

11

to pay as required by § 39-3-207, MCA, summary judgment was appropriate. *Jensen*, ¶ 14.

¶30 Contrary to our holding in *Jensen*, Harrell argues that Montana has two different applicable statutes of limitations, one for wages and one for penalties, and that the longer of the two should apply. Harrell relied on numerous cases[1] to argue that the five-year limitation period found in § 27-2-202(2), MCA, would apply to wage claims because § 39-3-207, MCA, only applies to penalties.

¶31 Section 39-3-207, MCA, was amended in 1999—after every case cited by Harrell—to address this concern and the plain language of the amended statute refutes Harrell's claim to a longer period of time in which to file. Prior to 1999, the statute provided, "Any employee may recover all such penalties as are provided for the violation of 39-3-206 which have accrued to him at any time within 18 months succeeding such default or delay in the payment of such wages." The amended statute is titled, "Period within which employee may recover *wages and* penalties." Section 39-3-207, MCA (amended language in italics). It provides the applicable statute of limitations for wage claims, stating, "An employee may recover all *wages and* penalties provided for the violation of 39-3-206 by filing a complaint within 180 days of default or delay in the payment of wages." Section 39-3-207(1), MCA (emphasis added). It is clear that the

---

[1] *Craver*, 265 Mont. 37, 874 P.2d 1; *State v. Wilson*, 189 Mont. 52, 614 P.2d 1066 (1980); *Delaware v. Kay-Decorators, Inc.*, 1999 MT 13, 293 Mont. 97, 973 P.2d 818; *Pope v. Keefer*, 180 Mont. 454, 591 P.2d 206.

12

statute is no longer limited to penalties. There is not a substantial question as to the statute of limitations that applies to wage claims: we apply the 180-day limitation to both wages and penalties. *Jensen*, ¶ 14.

      b.    *Overtime*

¶32    Harrell's claim to additional overtime pay missed the 180-day statute of limitations. The evidence submitted in the summary judgment proceedings did not support Harrell's claim that he was classified improperly as an exempt employee until the end of December 2010. Harrell was paid time-and-a-half overtime beginning in April 2010, around the time when MFU hired an independent firm to handle payroll. Harrell's own time records and the affidavit of the accounting firm's employee in charge of payroll, Melissa Smith, reflect that Harrell was paid overtime at one and one-half times the hourly rate whenever he worked more than forty hours per week from April 2010 forward, including his extra time conducting the camps during the summer of 2010. Harrell did not file his complaint until March 2011. Applying the 180-day statute of limitations to Harrell's claim for overtime wages, we conclude that this claim is clearly barred.

      c.    *Vacation*

¶33    Harrell's claim for vacation pay also fails to meet the statute of limitations. Harrell admits in his First Amended Complaint that MFU notified Harrell of his loss of earned vacation hours on April 30, 2010, when the independent accounting firm took

over payroll. At that time, MFU clearly refused to pay Harrell for more vacation time than was permitted by the handbook. Exhibits show that accumulated vacation time built up to over 232 hours, then a handwritten note from the accountant crossed out that number and inserted 120 hours on the April 2010 time record. This deduction was carried forward on all of Harrell's subsequent time records. Although Harrell continued to fill out his timesheets with the higher balance, there is a handwritten correction on every one reflecting the April 2010 deduction. Melissa Smith testified that Harrell received a pay stub each month reflecting this deduction from his vacation balance.

¶34 "[V]acation pay is earned by virtue of an employee's labor and once it has accrued, it has by definition been earned." *Langager v. Crazy Creek Prods.*, 1998 MT 44, ¶ 30, 287 Mont. 445, 954 P.2d 1169. Conversely, once it has been erased from the books, vacation time has been eliminated. Harrell's wage claim for vacation pay, therefore, accrued when MFU reduced the vacation time Harrell claimed to have been owed. MFU's removal of vacation hours from the balance for which Harrell could receive payment, of which he had express notice, started the clock on the statute of limitations. The complaint in this case was not filed until nearly a year after the claim arose. Harrell failed to file his claim within 180 days of April 30, 2010, as required by § 39-3-207, MCA, thus barring his wage claim for his vacation time.

### d. Estoppel

¶35 Harrell argues that MFU should be estopped from asserting a statute of limitations defense to his wage claims, relying on *Dagel v. Great Falls*, 250 Mont. 224, 819 P.2d 186 (1991). "Estoppel is not favored and will only be sustained on clear and convincing evidence." *Dagel*, 250 Mont. at 235, 819 P.2d at 193. Harrell asserts that MFU intentionally concealed from him whether he was incorrectly classified as exempt, which he did not learn until December 2010. Generally, "[l]ack of knowledge of the claim or cause of action, or of its accrual, by the party to whom it has accrued does not postpone the beginning of the period of limitation." Section 27-2-102(2), MCA. More specifically, the date on which an employee becomes aware that his position has been reclassified from exempt to non-exempt "is not a material fact and has no legal effect on when [the] wage claim accrued." *Jensen*, ¶ 13.

¶36 The question of "concealment" of facts in a statute of limitations inquiry is governed by § 27-2-102(3), MCA, which prevents the period of limitations from beginning if "facts constituting the claim are by their nature concealed or self-concealing" or "before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause." Equitable estoppel also may prevent the period of limitations from beginning where facts unknown to the party claiming the benefit of the estoppel are knowingly concealed. *Dagel*, 250 Mont. at 234-35, 819 P.2d at 192-93 (applying doctrine of equitable estoppel

15

to prevent the defendant from asserting that the plaintiff's WDEA claim was barred by "a written collective bargaining agreement at the time of her discharge" where the employer had denied the existence of such an agreement). We have not applied these theories to a statutory claim for wages and need not decide in this case whether they could apply to such a claim.

¶37 The problem with Harrell's estoppel argument is that the evidence clearly shows that he knew that he was being paid as a non-exempt employee and that his claim for vacation pay was denied long before December 2010. *See Arthur v. Pierre Ltd.*, 2004 MT 303, ¶ 34, 323 Mont. 453, 100 P.3d 987 (plaintiff failed to meet the third element of equitable estoppel due to personal knowledge of facts giving rise to her claim at the time she allegedly acted in reliance thereon). No parts of the alleged injuries or facts relating to the alleged injuries were concealed from Harrell. Harrell knew in April 2010 that his excess vacation hours were eliminated. With regard to the overtime claim, even if MFU determined that Harrell was classified erroneously and withheld its determination from him—which it denies—Harrell knew no later than mid-summer of 2010 that MFU began paying him overtime. The relevant fact is that MFU informed Harrell that his requests for payment were denied, precluding application of equitable estoppel because Harrell had personal knowledge of the facts giving rise to his claims at all times pertinent to the limitations inquiry. The statute of limitations for overtime and vacation expired and MFU is entitled to judgment as a matter of law on those claims.

### e. Extra Duties

¶38 Harrell's third claim under the wage statutes regarding "extra duties" does not meet the definition of a wage claim under the statute. Harrell claims that MFU should have increased his salary to account for the duties he assumed in the absence of an executive director. The statutes obligate the employer to pay only those wages actually earned by the employee. Section 39-3-201(6)(a), MCA, defines "wages" to include "any money due an employee from the employer or employers, whether to be paid by the hour, day, week, semimonthly, monthly, or yearly . . . ." Section 39-3-204(1), MCA, provides: "Except as provided in subsections (2) and (3), every employer of labor in the state of Montana shall pay to each employee the wages earned by the employee . . . ." Wage statutes do not apply to claims for wages that could have been earned but for breach of employment contract or wrongful termination because such wages were not "earned" as required by the wage statutes. *Myers v. Dept. of Agric.*, 232 Mont. 286, 291, 756 P.2d 1144, 1147 (1988). The Montana Wage Protection Act does not govern disputes over the rate of pay; it only governs the payment of actual wages due an employee.

¶39 The rate of compensation for work performed is normally defined by the employment contract. *McConkey v. Flathead Elec. Coop.*, 2005 MT 334, ¶ 23, 330 Mont. 48, 125 P.3d 1121. This Court has followed other courts in recognizing that an "employer is free to set the terms and conditions of employment and compensation and the employee is free to accept or reject those conditions." *Langager*, ¶ 25.

¶40    The obligation to pay wages only exists to the extent agreed upon between the employee and the employer. For example, in *McConkey*, an employee sought compensation under the wage statutes for "personal time," akin to vacation time, of which the employer had paid only 95%. The employee argued "that the District Court erred in holding that his personal time did not qualify as 'wages' pursuant to § 39-3-201(6)(a), MCA, and holding that he was thus not entitled to be paid for all such time he accrued at 100%." *McConkey*, ¶ 21. We concluded that "the payment of 95% of [the employee's] personal time was proper[,]" and that "the other 5% did not constitute wages that were part of [the employee's] agreed compensation." *McConkey*, ¶ 24. Thus, it is the law in Montana that one party cannot unilaterally decide that more wages are owed than the amount upon which the employer and employee have agreed.

¶41    Accordingly, the pivotal question is whether Harrell actually earned payment at a higher rate than he was paid. The evidence shows clearly that he did not. Although Harrell assumed a number of the previous executive director's tasks, MFU did not appoint him as an interim executive director or agree to pay him any additional compensation. Harrell estimated that he spent one hour per day on executive director duties and admitted that other employees also assumed some of the unfilled executive director position's duties. Harrell argued at trial that MFU deceived him into working "extra duties" by convincing him that he would receive additional pay, but he has not introduced any evidence showing that MFU ever actually offered him additional pay. It

18

appears that instead Harrell made an assumption that he would be paid more, and believed that he deserved to be paid more, despite receiving no assurance from MFU that he would receive additional compensation.

¶42 The MFU employee handbook explains, "Job descriptions are not fixed . . . they are guidelines only and can be expected to change over time." MFU paid Harrell for all the work he performed as MFU's education director. Even if he deserved a higher rate of pay, wages for the extra duties are not "due and payable" to Harrell. As MFU's counsel pointed out, nothing in the wage claim statutes permits an employee to claim a raise that was not given. The fact that Harrell was asked to complete tasks that did not fit within the express provisions of his job description, while perhaps adding to his constructive discharge theory, does not give rise to a wage claim, and Harrell's claim for wages for extra duties should have been dismissed on summary judgment.

   *f.    Conclusion*

¶43 The District Court erroneously allowed the jury to award unpaid wages to Harrell because the court incorrectly determined that the 180-day limitation period applied only to penalty requests and it should have dismissed the claim for extra duties. We reverse the District Court's denial of the Defendants' motion for summary judgment on all three of Harrell's wage claims. Because the wage claims are denied, a penalty cannot be assessed against MFU. Finally, because Harrell cannot recover on his wage claims, the attorney's fee award also must be vacated. The wage claims were the sole basis for the

19

fee award, *see* § 39-3-214, MCA, and MFU's claims regarding the amount of fees are moot.

¶44　　*2. Whether the District Court erred in denying judgment as a matter of law on Harrell's claim against Merrill individually.*

¶45　　Prior to and during trial, Merrill moved to dismiss the claims against him, arguing that as an employee and officer of MFU he could not be held individually liable for his actions under the facts of this case. The general rule is that only a stranger can interfere with contractual or business relationships. *Bolz v. Myers*, 200 Mont. 286, 292-94, 651 P.2d 606, 609-10 (1982). An agent of an employer is not a stranger to the employer's business contracts or relationships. *See Bellanger v. Am. Music Co.*, 2004 MT 392, ¶ 22, 325 Mont. 221, 104 P.3d 1075 ("Absent an agency relationship between him and AMC, Kelman's claimed privilege from suit for tortious interference based on agency does not apply.").

¶46　　No one disputes that Merrill is an agent of MFU. "An agency is actual when the agent is really employed by the principal." *Bellanger*, ¶ 19. Merrill was acting as the actual agent of MFU in all of his dealings with Harrell: Merill was paid a salary by MFU and there was no argument whatsoever that Merrill acted other than in the scope of his employment.

¶47　　Harrell asserts, however, that Merrill can be individually liable, even though he is an agent of MFU. "Corporate officers or directors are privileged to interfere with or induce breach of the corporation's contracts or business relations with others as long as

20

their actions are in good faith and for the best interests of the corporation." *Phillips v. Mont. Educ. Ass'n*, 187 Mont. 419, 425, 610 P.2d 154, 158 (1980). "An agent's acts, if motivated and taken in furtherance of the purposes and interests of its principal, will not give rise to a cause of action for tortious interference of a contract between its principal and a third party." *Lachenmaier v. First Bank Sys*, 246 Mont. 26, 34-35, 803 P.2d 614, 619 (1990). However, "[w]here an officer or director acts against the best interests of the corporation, acts for his own pecuniary benefit, or with the intent to harm the plaintiff, he is personally liable." *Phillips*, 187 Mont. at 425, 610 P.2d at 158.

¶48 "The personal nature of the agent's actions forms the narrow exception to the general policy that officers and agents of a corporation must be shielded from personal liability for acts taken on behalf of the corporation." *Ammondson*, ¶ 92 (quoting *Crystal Springs Trout Co. v. First State Bank of Froid*, 225 Mont. 122, 129, 732 P.2d 819, 823 (1987)). In *Ammondson*, we affirmed the district court's decision to submit individual tort claims against the corporate defendant's officers and directors to the jury. Our ruling was based on evidence that arguably could support a claim that the individual defendants participated in the decision to withhold notice until after the company filed for bankruptcy that the plaintiffs' pension contracts had been terminated; were involved in maliciously prosecuting claims against the plaintiffs in subsequent bankruptcy court litigation; and made decisions about the plaintiffs' retirement payments that were not based on a cost-benefit analysis for the company but with their own bonuses in mind.

21

*Ammondson*, ¶ 93.  We ultimately held that the district court's denial of judgment as a matter of law for the individual agents was appropriate in light of evidence suggesting that the agents personally participated in tortious conduct.  *Ammondson*, ¶ 94.

¶49    *Ammondson* is not applicable here.  First, the plaintiffs' claims in that case did not arise from their alleged wrongful termination from employment, for which the WDEA provides an exclusive remedy.   Section 39-2-902, MCA.   Second, though Harrell portrayed Merrill as incompetent and demeaning to women, he did not introduce evidence at trial that, with respect to Harrell, Merrill acted against the best interests of the corporation, for his own pecuniary benefit, or with intent to harm Harrell personally.  The substance of the allegations against Merrill was that, while acting as president of MFU, he told the board falsely that Harrell was underperforming.  Harrell fails to show that by communicating his opinions to the board while acting in his professional capacity, Merrill acted against MFU's corporate purposes and interests.  Negative opinions of Harrell's performance by his boss, on their own, do not rise to the level of tortious interference without some indication that Merrill had a private pecuniary motive or a personal desire to ruin Harrell.

¶50    Third, the jury was not instructed on the proper standard of law.  "[T]he law regarding personal liability of a corporate officer or director [was] set forth by this Court in *Phillips* . . . ."  *King v. Zimmerman*, 266 Mont. 54, 62, 878 P.2d 895, 900 (1994).  In *King*, we approved the following jury instruction based on our decision in *Phillips*:

22

Corporate officers or directors are privileged to interfere with or induce breach of the corporation's contracts or business relations with others as long as their actions are in good faith and for the best interests of the corporation. Where an officer or director acts against the best interests of the corporation, acts for his own pecuniary benefit, or with intent to harm the plaintiff, he is personally liable.

*King*, 266 Mont. at 62, 878 P.2d at 900. Here, the jury was not instructed on this rule from *Phillips*. Rather, Harrell submitted and the District Court gave—over MFU's objection—an instruction based on *Bolz*, which set forth the standards that apply to a third party's interference with a contract. *Bolz*, 200 Mont. at 295, 651 P.2d at 611. Merrill is not personally liable under the legal standards that govern this case.

¶51 Finally, while the jury found that MFU acted fraudulently and with malice, no such finding was made with regard to Merrill individually. The privilege of limited liability applies here, and Merrill is shielded from personal liability.

¶52 *3. Whether MFU is entitled to a new trial on Harrell's constructive discharge claim.*

¶53 MFU argues that the District Court erred in denying its motions for a mistrial and for a directed verdict on the issue of constructive discharge under the WDEA, and requests that this Court reverse the jury's verdict on that claim. MFU points to Harrell's use of deposition excerpts, the court's curative instruction regarding a proffered piece of evidence, and evidence from the *Kassmier* case to support this argument on appeal. "A district court possesses broad discretion to determine the admissibility of evidence." *Malcolm v. Evenflo Co.*, 2009 MT 285, ¶ 29, 352 Mont. 325, 217 P.3d 514. The majority

23

of these alleged errors fall within the broad discretion afforded the district court in making evidentiary rulings, and—though we do find some error—we conclude that cumulatively the alleged errors do not entitle MFU to a new trial on this issue.

### a.    Deposition Use

¶54    MFU argues that Harrell's use of Merrill's deposition at trial was improper.  MFU proposes that under M. R. Civ. P. 32(a)(6), the court should have required Harrell to play the entire deposition, instead of allowing Harrell to play potentially misleading excerpts. M. R. Civ. P. 32(a)(6) allows an adverse party to require the offeror of part of a deposition to "introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts."  Deposition testimony is admissible "to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Montana Rules of Evidence."  M. R. Civ. P. 32(a)(2).  "The trial court has discretion to exclude parts of the deposition that are unnecessarily repetitious in relation to the testimony of the party on the stand . . . ." *Hart-Albin Co. v. McLees Inc.*, 264 Mont. 1, 8, 870 P.2d 51, 55 (1994).

¶55    The District Court ruled that fairness required only that MFU be allowed to introduce Merrill's entire deposition in its own case in chief, which MFU declined to do. The court did not abuse its discretion.

24

### b. *Curative Instruction*

¶56    MFU argues that a curative instruction offered to the jury was misleading and prejudicial. The curative instruction stated that MFU attempted to elicit testimony regarding a document that was "generated [by MFU] in an effort to mislead the jury," "would have misled the jury," was of "suspect" origin, and was "not credible." The court read the document into the record outside the presence of the jury, but the document was not allowed into evidence.

¶57    The document in question was an unsigned and unsent letter purportedly written to Harrell by MFU board member Leonard Stone, MFU Vice President Rollie Schlepp, and Merrill. Stone testified that the letter was drafted by Schlepp. MFU failed to produce the letter during discovery, even though it was within the scope of Harrell's discovery requests. MFU claimed that it did not discover the letter until after the trial began. MFU produced the letter during the first week of trial.

¶58    When MFU called Stone to the witness stand, MFU's counsel asked about Harrell's repeated grievances and what MFU did to respond. When Stone mentioned that the Vice President had "formulated a letter," Harrell objected and requested a discussion without the jury present. Once the jury was excused, Harrell objected to the late disclosure of the letter and suggested the possibility that the letter had been drafted during the trial. The District Court shared Harrell's skepticism regarding the letter's origin, remarking that the letter, which appeared to have been drafted by a lawyer, was being

offered during the trial to confuse the jury into believing that MFU had written a response to Harrell's complaints. Throughout the trial, Harrell had presented letters he had written to MFU expressing his grievances. Until Stone mentioned this letter, MFU had maintained that it had responded to Harrell only verbally. The court commented that by presenting the letter, MFU could bolster its argument that it actively responded to Harrell's concerns. MFU maintained that it never intended to introduce the document, despite that it was marked with an exhibit sticker. The record does not confirm whether or not MFU did in fact fabricate this document during the trial.

¶59 Harrell's counsel requested that the court sanction MFU for referring to the document and possibly attempting to introduce it into evidence. The court initially considered imposing the harshest possible sanction for discovery abuses—judgment on liability as a matter of law—noting this Court's holding in *Bulen v. Navajo Ref. Co.*, 2000 MT 222, 301 Mont. 195, 9 P.3d 607 (holding that the district court did not abuse its discretion when it imposed judgment on liability as a matter of law against the defendants for repeatedly failing to comply with the rules of discovery). *See also Richardson v. State*, 2006 MT 43, 331 Mont. 231, 130 P.3d 634. The court eventually decided against this sanction.

¶60 Harrell's counsel also requested a curative instruction to correct any prejudice that could result from forcing her to object in a manner that likely caused the jury to believe that Harrell was concealing an important document. The court drafted a curative

instruction that it believed was of sufficient force to cure the problems created by MFU's attempts to elicit testimony about a document that it failed to timely disclose.

¶61 "Generally, it is up to the trial court to decide the proper sanction for discovery abuse." *Richardson*, ¶ 65. "We defer to the trial court because it is in the best position to know whether the party in question has disregarded the other's rights, and is in the best position to determine which sanction is most appropriate." *Bulen*, ¶ 18. We cannot substitute our own discretion for that of the District Court on this evidentiary issue. The court reasonably believed that MFU's mid-trial disclosure of a document helpful to its case affected Harrell's right to fair and timely discovery resulting in prejudice. We conclude that the court was within its discretion to give the curative instruction.

    *c.    The Kassmier Evidence*

¶62 References to the *Kassmier* case by both parties began in opening statements and escalated throughout the trial. MFU argues on appeal that the court abused its discretion by admitting the evidence.[2]

¶63 Following the conclusion of the Plaintiff's opening statement, the District Court recessed out of the jury's presence to consider the parties' arguments regarding the *Kassmier* evidence. MFU argued that the evidence was inadmissible propensity or character evidence barred by M. R. Evid. 404(b). Harrell argued that it was "pattern and

---

[2] MFU also claims that *Fandrich v. Capital Ford Lincoln Mercury*, 272 Mont. 425, 901 P.2d 112 (1995), precludes Harrell from claiming that MFU retaliated against him on the basis of the *Kassmier* affidavit. Because Harrell's constructive discharge claim was not founded on Kassmier's sexual harassment complaint, the Human Rights Act was not Harrell's exclusive remedy and *Fandrich* does not apply.

27

practice evidence, Rule 404(b)," and admissible to show that MFU had on other occasions treated its employees with hostility, created adverse job conditions, and retaliated against the objecting employee. The District Court determined that the *Kassmier* evidence was admissible pursuant to M. R. Evid. 406 and that Harrell was on "solid ground" if the evidence was being offered to "establish[] common practices within the company." The District Court also considered admissibility of the evidence pursuant to Rule 404(b) and cautioned Harrell's counsel not to "go too far." The court recognized that the evidence was inflammatory and prejudicial to MFU, but refused to allow MFU to "sanitize" the case by isolating Harrell's allegations. The District Court assured MFU's counsel that they would be allowed to defend against the *Kassmier* evidence, but refused to rule on any specific item of evidence until it was offered.

¶64     As the District Court ruled the evidence admissible under M. R. Evid. 406, we first consider that theory of admissibility. Rule 406 states that "[e]vidence of habit or of routine practice, whether corroborated or not, and regardless of the presence of eyewitnesses, is relevant to prove that conduct on a particular occasion was in conformity with the habit or routine practice." "Habit" is defined as "a person's regular response to a repeated specific situation" and "routine practice" as "a regular course of conduct of a group of persons or an organization." M. R. Evid. 406.

¶65     The District Court erred in ruling that the *Kassmier* evidence, which was the only other employment claim against MFU identified by the parties, was allowable under

28

M. R. Evid. 406. More than one dispute is required to show "habit" under M. R. Evid. 406. *See Mydlarz v. Palmer/Duncan Constr. Co.*, 209 Mont. 325, 342-43, 682 P.2d 695, 704 (1984) ("In our view one instance of alleged carelessness does not indicate habitual carelessness."). Under the corresponding federal evidentiary rule, courts have held that "to prove an act was habitual [requires] the proponent to offer evidence of numerous, consistent occurrences of the act." *U.S. v. Oldbear*, 568 F.3d 814, 822 (10th Cir. 2009) ("only three instances of the supposed habit [were] certainly not sufficient to demonstrate a habitual pattern"); *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1232-33 (10th Cir. 2001) (noting that five acts ordinarily are insufficient to establish a habit under F. R. Evid. 406). In the same vein, one prior claim of sexual harassment cannot establish a "routine practice," particularly in a case that was not about sexual harassment.

¶66    Though the evidence was inadmissible under M. R. Evid. 406, the District Court also considered its admissibility under M. R. Evid. 404(b). Rule 404(b) places a limitation on otherwise relevant evidence when that evidence is of "other crimes, wrongs, or acts" offered to prove that a person acted in conformity with his or her character. Implicit within the rule is the assumption that evidence of propensity is of slight probative value and often prejudicial. Character evidence nevertheless may be admissible for an alternative purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M. R. Evid. 404(b). If the evidence meets one of the alternative purposes, the trial court must

consider its probative value in light of the purpose for which it is offered and balance the probative value of the evidence against its potential for prejudice. M. R. Evid. 403.

¶67     As a general rule, this Court does not allow remote or dissimilar events into evidence. *See Faulconbridge*, ¶ 30. In the context of employment actions, we have held that "[e]vidence of other [employees'] disciplinary actions is not relevant to whether the actions of [the plaintiff employee] justify the termination of his employment." *Wolny v. City of Bozeman*, 2001 MT 166, ¶ 38, 306 Mont. 137, 30 P.3d 1085. We relied in *Wolny* on our prior "review of the pertinent precedent[, which] shows that past conduct or action is never admissible as relevant in a case regarding a specific charge." *Wolny*, ¶ 38 (quoting *In re Raynes*, 215 Mont. 484, 492, 698 P.2d 856, 861 (1985) (affirming the grant of a protective order on the basis that "information concerning various disciplinary cases that occurred to officers of the Great Falls Police Department over a ten year period" was irrelevant)).

¶68     In this case, however, Harrell maintained that his affidavit in the *Kassmier* case and his memo to the executive board regarding discriminatory policies supported his claim that MFU had reasons to retaliate against him and were relevant to proving his constructive discharge claim. Given the theory of his case, it was within the District Court's discretion to allow the presentation of evidence from the *Kassmier* case in order to demonstrate MFU's motive or intent in its dealings with Harrell. *See Brundridge v. Flour Fed. Servs., Inc.*, 191 P.3d 879, 888 (Wash. 2008) (holding that in the context of

wrongful discharge in violation of public policy, evidence of employer retaliation against other employees is relevant to show motive or intent).

¶69 We conclude that the District Court did not abuse its discretion in permitting some evidence of the context for Harrell's claim to show motive or intent for his harassment or discharge. The *Kassmier* evidence tended to show that MFU had a motive to ostracize and constructively discharge Harrell. The deterioration of Harrell's working conditions arguably was related, at least in part, to his perceived support for Katie Kassmier. Although some of the evidence pushed the limits of Rules 402, 403, and 404, both parties had a hand in its introduction and we cannot say that the court abused its discretion in holding that the probative value of the evidence was outweighed by the danger of unfair prejudice. "We may affirm a district court decision that is correct regardless of the district court's reasoning in reaching its decision." *PacifiCorp v. State*, 2011 MT 93, ¶ 54, 360 Mont. 259, 253 P.3d 847. Harrell properly was allowed to introduce some evidence of MFU's prior acts to show the context of his allegation that MFU had a motive to retaliate against him.

¶70 But while some of the *Kassmier* evidence was relevant and otherwise admissible to show motive or intent, we conclude that the District Court erred when it allowed Harrell to discuss the settlement from the *Kassmier* case. To be admissible, evidence must be relevant, meaning the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

31

probable than it would be without the evidence." M. R. Evid. 401. The rules of evidence prohibit the admission of settlement evidence to prove liability. M. R. Evid. 408; Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* vol. 23, § 5301 at 159 (2005) ("While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto.").

¶71     This Court previously reversed a jury verdict where the trial court allowed a party to introduce a settlement amount into evidence. *Beil v. Mayer*, 242 Mont. 204, 789 P.2d 1229 (1990). In *Beil*, we held that evidence relating to the plaintiff's settlement from a previous accident "served to interject immaterial, prejudicial information into the trial" when it was offered by the defendant on the issue of damages. *Beil*, 242 Mont. at 207, 789 P.2d at 1232. We explained that a settlement amount "rarely has any relevance to the determination of damages at issue in the present trial." *Beil*, 242 Mont. at 207-08, 789 P.2d at 1232. We also observed that the settlement amount "does not give the jury a true picture of the reason for the settlement amount" because a party often "will accept a settlement for reasons which are extraneous to the true issue at hand." *Beil*, 242 Mont. at 208, 789 P.2d at 1232. As we stated in *Azure v. Billings*, 182 Mont. 234, 245, 596 P.2d 460, 466 (1979), "[t]he amount of the settlement could adversely affect the defendant because there is a virtual admission of negligence by the settling party . . . ." There is the strong policy concern that allowing evidence from previous settlements, unless absolutely

32

necessary, will discourage parties from reaching a compromise. *DeTienne Assocs. Ltd. Partner. v. Mont. Rail Link*, 264 Mont. 16, 22, 869 P.2d 258, 262 (1994).

¶72 We echoed this concern in our recent ruling that Montana law prohibits introducing evidence from confidential mediations. *Kluver v. PPL Mont., LLC*, 2012 MT 321, ¶ 58, 368 Mont. 101, 293 P.3d 817. We emphasized in *Kluver* that the law "expressly prohibits the disclosure of 'all mediation-related communications, verbal or written' made during mediation absent consent or an express statutory exception." *Kluver*, ¶ 52 (quoting § 26-1-813(3), MCA). In *Kluver*, although we did not find the error reversible because of other evidence sufficient to support the trial court's ruling in that case, we stressed the zero-tolerance policy in the law prohibiting evidence of what occurred during mediation. *Kluver*, ¶¶ 59-60.

¶73 Notwithstanding the factual differences between these cases and the settlement at issue here, the rule that the amount of a previous settlement is not generally admissible nonetheless applies. Harrell's counsel referenced the confidential settlement several times during trial; counsel questioned more than one witness about it and suggested that MFU would not have agreed to a settlement "north of six figures" if it had done nothing wrong. She then stated a specific dollar amount in the punitive phase of the trial. Harrell's argument that MFU "opened the door" to this evidence falls short because Harrell's counsel started discussing *Kassmier* in her opening statement.

33

¶74    Finally, the settlement amount does not fall within Rule 408's limited exception as showing MFU's bias or prejudice against Harrell in this case. *Cf. Tripp v. Jeld-Wen*, 2005 MT 121, 327 Mont. 146, 112 P.3d 1018. In *Tripp*, we upheld the admission of a settlement between the plaintiff homeowners and their contractor over the installation of a faulty floor. The evidence was introduced by the floor's manufacturer, the defendant in the case, who had named the contractor as a third-party defendant. We agreed that the settlement was relevant to show the contractor's bias and therefore permissible under Rule 408. *Tripp*, ¶ 20. The contractor, who testified as a witness for the plaintiff, obviously had an interest in minimizing his own liability as a third-party defendant in the action.

¶75    In contrast, the *Kassmier* settlement was introduced for the express purpose of demonstrating a "pattern and practice" of mistreatment of MFU employees—to prove liability for Harrell's alleged constructive discharge. This is not a proper purpose under Rule 408. The settlement of that case has no bearing on any fact of consequence and is not relevant to whether Harrell was constructively discharged. Particularly in light of numerous references in front of the jury to MFU's alleged "pattern and practice," which we also have determined was not correct, the settlement amount was improperly admitted and served no purpose other than to prejudice the jury against MFU.

*d.    Conclusion*

¶76    "Courts will exercise the greatest self-restraint in interfering with the constitutionally-mandated process of jury decision." *Cameron v. Mercer*, 1998 MT 134, ¶ 8, 289 Mont. 172, 960 P.2d 302. We will not reverse a jury's verdict for improperly admitted evidence unless "substantial prejudice to the complaining party [is] shown." *Green v. Green*, 181 Mont. 285, 293, 593 P.2d 446, 451 (1979); M. R. Civ. P. 61 (requiring this Court to "disregard all errors and defects that do not affect any party's substantial rights"). Put another way, "a reversal cannot be predicated upon an error in admission of evidence, where the evidence in question was not of such character to have affected the result." *In re A.N.*, 2000 MT 35, ¶ 55, 298 Mont. 237, 995 P.2d 427; *Mason v. Ditzel*, 255 Mont. 364, 371, 842 P.2d 707, 712 (1992); *Lauman v. Lee*, 192 Mont. 84, 90, 626 P.2d 830, 834 (1981). Having determined that some of the circumstances of the prior sexual harassment lawsuit and Harrell's role in it properly were allowed, we must consider whether the mention of the settlement amount was so significant as to warrant reversal of the finding that MFU constructively discharged Harrell.

¶77    A constructive discharge under the WDEA occurs when the employer creates a situation in which "an objective, reasonable person would find [the work environment] so intolerable that voluntary termination is the only reasonable alternative." Section 39-2-903(1), MCA. "[W]hether a constructive discharge has occurred is usually a question of fact determined by the totality of the circumstances." *Bellanger*, ¶ 14. The jury was

presented with ample evidence over a nearly two-week trial to support its verdict finding constructive discharge. The District Court summarized this evidence:

> This is what I've heard throughout this case[.] Mr. Harrell was put on the stand. Did you file a grievance? Letter, after letter, after letter was presented. [MFU] complained about his letters. They thought he was being vexatious and troublesome, and a thorn in their side. And what he was doing, from the Court's vantage point, was sticking up for his rights. He felt that he wasn't paid properly salary-wise. He thought that he wasn't being given credit for time and working overtime at the rate of one and a half times his salary. He felt that other individuals in the organization were given preferential treatment. He didn't think the organization was running properly. And he wanted to contribute to help that organization be the best that it could be. And he was rebuffed.

Evidence showed that MFU ostracized and penalized Harrell for standing up to MFU's management.

¶78 Further, due to the restrictive statutory method for calculating damages under the WDEA, the inadmissible evidence was not reasonably of such character as to have affected the award of actual damages. The strict damages formula in the WDEA limits recovery to "lost wages and fringe benefits for a period not to exceed 4 years from the date of discharge together with interest on the lost wages and fringe benefits. Interim earnings, including amounts the employee could have earned with reasonable diligence, must be deducted from the amount awarded for lost wages." Section 39-2-905(1), MCA. The jury was presented with specific evidence of Harrell's wage loss and his interim earnings, and it correctly applied the deductions in arriving at its damage calculations.

¶79 "When the trial court makes an error, but sufficient facts are otherwise established by independent evidence and substantial justice has been done such that the error is harmless, the Montana Supreme Court will not disturb the ruling of the lower court." *Renner v. Nemitz*, 2001 MT 202, ¶ 28, 306 Mont. 292, 33 P.3d 255 (citing M. R. Civ. P. 61; M. R. App. P. 14). In light of the other substantial evidence presented by Harrell and the strict limitations on WDEA damages, we conclude that introduction of the settlement amount did not substantially prejudice Harrell or significantly affect the result with regard to Harrell's claim. We uphold the jury's verdict finding constructive discharge, despite our finding of error in the admission of evidence.

¶80 *4. Whether punitive damages properly were awarded against MFU.*

¶81 MFU requests that this Court reverse the punitive damage award because "[t]here was no evidence that MFU requested Harrell to violate any public policy," several jury instructions and the verdict form were unclear because they did not sufficiently identify the liable defendant, and the District Court admitted improper evidence. In the alternative, MFU claims that the District Court improperly refused to limit the punitive damages award to three percent of MFU's net worth as required by § 27-1-220(3), MCA.

     *a.     Punitive Damage Award*

¶82 To prevail on a claim for punitive damages in an action for constructive discharge under the WDEA, an employee must "establish[] by clear and convincing evidence that the employer engaged in actual fraud or actual malice in the discharge of the employee in

37

violation of § 39-2-904(1)(a)." Section 39-1-905(2), MCA. Violation of § 39-2-904(1)(a), MCA, requires that the wrongful discharge was "in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy."

¶83 "A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff." Section 27-1-221(2), MCA. "A defendant is guilty of actual fraud if the defendant: (a) makes a representation with knowledge of its falsity; or (b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury." Section 27-1-221(3), MCA.

¶84 Harrell's claim to punitive damages for violation of the WDEA is predicated on his alleged refusal to violate the law requiring payment of wages and overtime. We have held that "overtime premiums are for the protection and benefit of the general public" and that an attempt to waive the right to overtime is contrary to public policy. *Lewis v. B & B Pawnbrokers, Inc.*, 1998 MT 302, ¶ 23, 292 Mont. 82, 968 P.2d 1145. While the wage claims are barred by the statute of limitations, the jury still properly could find that Harrell's refusal to violate public policy by asserting his statutory right to wages prompted his constructive discharge.

¶85 Next, the verdict form clearly shows the jury found that MFU, not Merrill, acted with actual fraud and actual malice. Likewise, because the jury instructions were organized by issue and the court made clear that punitive damages were only available against MFU for the constructive discharge claim, the court did not err in instructing the jury.

¶86 Finally, there was sufficient evidence to submit the punitive damages claim to the jury. Introduction of the *Kassmier* settlement makes this issue a close call. But the evidence was sufficient to establish that MFU retaliated against Harrell for a multitude of reasons that all implicate public policy: for refusing to waive his right to overtime and vacation, for insisting on fair pay for the work that he was performing, and for challenging MFU's practices that he believed were unfair to its female employees. We hold that the punitive damages claim properly went to the jury.

### b. Statutory Limit

¶87 MFU claims in the alternative that the District Court improperly refused to limit the punitive damages award to three percent of MFU's net worth as required by § 27-1-220(3), MCA. That section states, "An award for punitive damages may not exceed $10 million or 3% of a defendant's net worth, whichever is less."

¶88 Following a finding that a defendant is liable for punitive damages, a jury must consider evidence of a defendant's net worth in a separate proceeding to determine the amount of the award. Section 27-1-221(7)(a). A defendant who offers no evidence of

net worth waives any claim that the statutory limit should be applied. *Blue Ridge Homes, Inc. v. Thein*, 2008 MT 264, ¶¶ 60-64, 345 Mont. 125, 191 P.3d 374. In *Blue Ridge*, the district court found that the defendants refused to submit any accurate financial statement and that the self-prepared document on which they attempted to rely was not reliable evidence. In addition, the defendants "refused to respond to requests for production and interrogatories on this issue." *Blue Ridge*, ¶ 65. The defendants never submitted reliable financial information at any point in the proceedings. This Court affirmed the district court's refusal to apply the limitation prescribed by § 27-1-220(3), MCA, holding that the defendants failed to meet their burden of demonstrating an accurate calculation of their net worth. *Blue Ridge*, ¶ 70. In so ruling, we explained that a defendant is not permitted to "gain an advantage from failing to produce evidence of his net worth." *Blue Ridge*, ¶ 69.

¶89 During the liability phase of the trial, Harrell introduced an audited 2008-2009 financial statement that specified MFU's net worth during the last years of Harrell's employment. Both parties referenced this financial statement during the trial's punitive damages phase. MFU used the exhibit to rebut Harrell's claim that an award should be based on the $10-$12 million value of the larger Farmers Union Enterprises and to argue that MFU's total assets were $2.7 million in 2009. Harrell did not object to MFU's use of the exhibit during the punitive damages phase of the trial. Harrell argued to the jury that the financial information was not sufficiently current or credible, but did not offer

any countering evidence of MFU's current net worth. The jury took the statement into the jury room during its deliberation on punitive damages. Properly, the jury was told nothing about the statutory limit.

¶90 Immediately following the jury's punitive damages verdict, MFU filed a motion requesting that the court apply the statutory limit to reduce the $300,000 damage award. Harrell opposed this motion on the grounds that MFU "offered no evidence of [its] net worth." MFU then filed a renewed motion to cap the punitive damages award, this time with an affidavit from MFU's auditor that attested to the accuracy of the previously submitted 2008-2009 financial statement. The auditor also attached MFU's statement for 2010-2011, which she stated was the most recent statement available as of September 21, 2012.

¶91 In its order affirming the jury's punitive damages award, the District Court expressed concerns that the 2008-2009 financial statement was "stale" and did not accurately reflect MFU's current net worth or follow Generally Accepted Accounting Principles (GAAP). The court refused MFU's request to consider the current financial statement because MFU asked the court to consider the statement "weeks after the close of trial" and because the statements "should have been presented to the jury before it deliberated on the amount of punitive damages." The District Court thus concluded that MFU had failed to present evidence of its net worth and denied MFU's request to limit the award.

¶92 The District Court was within its discretion to find that the statement on which the parties had relied was not the best evidence of MFU's net worth at the time of trial. But it is the court, not the jury, that applies the statutory limit to a punitive damages verdict under § 27-1-220(3), MCA. *See Blue Ridge*, ¶ 68. Thus, the question here is not whether the evidence came too late for consideration by the jury. Instead, the question is whether allowing MFU to submit more current evidence of its net worth after the jury's punitive damages verdict allows MFU to "gain an advantage" by its failing to produce the evidence before the jury. *Blue Ridge*, ¶ 69.

¶93 On the record before us, we conclude that MFU does not gain any advantage by consideration of the updated financial information and that the District Court erred by failing to follow the requirements of the statute. Harrell is not prejudiced by consideration of the late-filed updated financial statements because the jury did consider net worth evidence and its punitive damages verdict exceeds three percent of MFU's net worth regardless of which statement is used.

¶94 Therefore, after the jury returned its punitive damages verdict and after Harrell voiced objection to the 2008-2009 financial statement, the court should have accepted MFU's submission of its current audited financial information and applied the statute's three percent limit to the jury's award. Harrell benefits from applying the statutory limit to the updated financial information instead of to the 2009 net worth, and the 2011 net worth should be used to calculate the proper amount of damages. We therefore vacate

the punitive damages award and remand for application of § 27-1-220(3), MCA, to MFU's 2011 net worth.

## CONCLUSION

¶95    We hold that MFU was entitled to summary judgment on Harrell's wage claims and that liability cannot be imposed on Merrill individually.  We vacate the jury's damage awards for wages and penalties under the wage claim statutes, and its award of damages against Merrill.  We also vacate the District Court's award of attorney's fees.  We affirm the jury's verdict on Harrell's claim for constructive discharge and its decision to award punitive damages.  We vacate the punitive damages award and remand the case to the District Court for application of the statutory limit.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ JIM RICE

43